# GLOUCESTER FERRY COMPANY *v.* PENN-SYLVANIA.

## IN ERROR TO THE SUPREME COURT OF THE STATE OF PENNSYLVANIA.

### Argued March 13, 1885.—Decided April 13, 1885.

Commerce among the States consists of intercourse and traffic between their citizens, and includes the transportation of persons and property, and the navigation of public waters for that purpose, as well as the purchase, sale and exchange of commodities.

The power to regulate commerce, inter-State and foreign, vested in Congress, is the power to prescribe the rules by which it shall be governed, that is, the conditions upon which it shall be conducted; to determine when it shall be free and when subject to duties or other exactions.

As to those subjects of commerce which are local or limited in their nature or sphere of operation, the State may prescribe regulations until Congress assumes control of them.

As to such as are national in their character, and require uniformity of regulation, the power of Congress is exclusive; and until Congress acts, such commerce is entitled to be free from State exactions and burdens.

The commerce with foreign nations and between the States, which consists in the transportation of persons and property between them, is a subject of national character, and requires uniformity of regulation.

The business of receiving and landing of passengers and freight is incident to their transportation, and a tax upon such receiving and landing is a tax upon transportation and upon commerce, inter-State or foreign, involved in such transportation.

The only interference by a State with the landing and receiving of passengers or freight arriving by vessels from another State or from a foreign country which is permissible, is confined to measures to prevent confusion among the vessels, and collisions between them, to insure their safety and convenience, and to facilitate the discharge or receipt of their passengers and freight.

Inter-State commerce by corporations is entitled to the same protection against State exactions which is given to such commerce when carried on by individuals.

The transportation of passengers and freight for hire by a steam ferry across the Delaware River from New Jersey to Philadelphia by a corporation of New Jersey is inter-State commerce, which is not subject to exactions by the State of Pennsylvania.

Freedom of transportation between the States, or between the United States and foreign countries, implies exemption from charges other than such as are imposed by way of compensation for the use of the property employed, or for facilities afforded for its use, or as ordinary taxes upon the value of the property.

In March, 1865, the Gloucester Ferry Company, the plaintiff in error here, was incorporated by the Legislature of New Jersey to establish a steamboat ferry from the town of Gloucester, in that State, to the city of Philadelphia, in Pennsylvania, with a capital stock of $50,000, divided into shares of $50 each. During that year it established, and has ever since maintained, a ferry between those places, across the river Delaware, leasing or owning steam ferry-boats for that purpose. At each place it has a slip or dock on which passengers and freight are received and landed; the one in Gloucester it owns, the one in Philadelphia it leases. Its entire business consists in ferrying passengers and freight across the river between those places. It has never transacted any other business. It does not own, and has never owned, any property, real or personal, in the city of Philadelphia other than the lease of the slip or dock mentioned. All its other property consists of certain real estate in the county of Camden, New Jersey, needed for its business, and steamboats engaged in ferriage. These boats are registered at the port of Camden, New Jersey. It has never owned any boats registered at a port of Pennsylvania, and its boats are never allowed to remain in that State except so long as may be necessary to discharge and receive passengers and freight.

In July, 1880, the Auditor-General and the Treasurer of the State of Pennsylvania stated an account against the company of taxes on its capital stock, based upon its appraised value, for the years 1865 to 1879, both inclusive, finding the amount of $2,593.96 to be due the Commonwealth. From this finding an appeal was taken to the Court of Common Pleas of Philadelphia, and was there heard upon a case stated, in which it was stipulated that, if the court were of opinion that the company was liable for the tax, judgment against it in favor of the Commonwealth should be entered for the above amount; but. if the court were of opinion that the company was not liable, judgment should be entered in its favor.

A statute of Pennsylvania, passed June 7, 1879, " to provide revenue by taxation," in its fourth section enacted as follows: " That every company or association whatever, now or here-

after incorporated by or under any law of this Commonwealth, or now or hereafter incorporated by any other State or Territory of the United States or foreign government, and doing business in this Commonwealth, or having capital employed in this Commonwealth in the name of any other company or corporation, association or associations, person or persons, or in any other manner, except foreign insurance companies, banks and savings institutions, shall be subject to and pay into the treasury of the Commonwealth annually a tax to be computed as follows, namely: If the dividend or dividends made or declared by such company or association as aforesaid, during any year ending with the first Monday of November, amount to six or more than six per centum upon the par value of its capital stock, then the tax to be at the rate of one-half mill upon the capital stock for each one per centum of dividend so made or declared; if no dividend be made or declared, or if the dividend or dividends made or declared do not amount to six per centum upon the par value of said capital stock, then the tax to be at the rate of three mills upon each dollar of a valuation of the said capital stock," made in accordance with the provision of another section of the act.

It was under the authority of this act that the taxes in question were stated against the company by the Auditor-General and the State Treasurer.

The Court of Common Pleas held that the taxes could not be lawfully levied, for there was no other business carried on by the company in Pennsylvania except the landing and receiving of passengers and freight, which is a part of the commerce of the country, and protected by the Constitution from the imposition of burdens by State legislation. It, therefore, gave judgment in favor of the company. The case being carried on a writ of error to the Supreme Court of the State, the judgment was reversed and judgment ordered in favor of the Commonwealth for the amount mentioned. To review this latter judgment, the case was brought here.

*Mr. John G. Johnson* and *Mr. Morton P. Henry* for plaintiff in error.

*Mr. Robert Snodgrass,* Deputy Attorney-General of Pennsylvania, for defendant in error.—The propositions of the plaintiff in error amount to this: that the State cannot tax a foreign corporation in respect to its capital stock, if it is engaged in inter-State commerce. This cannot be true abstractly, without overturning *Minot* v. *Philadelphia, Wilmington & Baltimore Railroad Co.,* 18 Wall. 206. The proposition is therefore not of universal application. The corporation with which we have to deal in this case is a ferry company, and it is, therefore, pertinent to inquire what we understand by such a company. In the Terms of the Law, 338, a ferry is said to be " a liberty by prescription, or the king's grant, to have a boat for a passage upon a great stream, for carrying of horses and men for reasonable toll." In *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420, Justice Story said: " It is a franchise which approaches so near to that of a bridge, that human ingenuity has not, as yet, been able to state any assignable difference between them, except that one includes the right of pontage, and the other of passage or ferriage," p. 620. " A public ferry," said he, " is a public highway of a special description, and its termini must be in places where the public have rights, as towns, or villes, or highways leading to towns or villes," p. 622. These definitions will serve to indicate the nature of a ferry franchise as understood and declared by the older authorities.

There is no controversy as to the transportation; or that it takes place over a navigable river. But it does not follow that it is " commerce" within the meaning which the framers of the Constitution attached to the term. The criterion of the business called commerce in the constitutional sense is that it shall be free from State or local control, and subject only to national control. *Osborne* v. *Mobile,* 16 Wall. 479 ; *Railroad Co.* v. *Maryland,* 21 Wall. 456, 470. That freedom cannot be predicated of a ferry company. People are not at liberty to establish a ferriage over a navigable river separating two States, without regard to State authority. In saying this we are not to be understood as asserting that a ferry may not be, or in this case, is not an instrument of commerce. It is as much so,

and perhaps, in the same sense as a bridge, but in any case it is, at most, no more than a local aid or instrument, which Congress has never undertaken to regulate or control. The distinction which we are here seeking to draw was forcibly recognized by Mr. Justice Field, in *County of Mobile* v. *Kimball*, 102 U. S. 691, at p. 702.

It is well settled that States have the power to establish and regulate ferries and other local aids to commerce. *Conway* v. *Taylor*, 1 Black, 603 ; *People* v. *Babcock*, 11 Wend. 586 ; *State*. v. *Hudson County*, 3 Zabr. 206 ; Chief Justice Marshall in *Gibbons* v. *Ogden*, 9 Wheat. 1, at page 203 ; *Fanning* v. *Gregorie*, 16 How. 524 ; *Wiggins Ferry Co.* v. *East St. Louis*, 107 U. S. 365 ; *Charles River Bridge* v. *Warren Bridge*, above cited ; *Trustees of Schools* v. *Tatman*, 13 Ill. 27. Ferry-boats are restricted to ply between given points, and by a prescribed course. They pass and repass between their landing places without clearances under the navigation statutes. Although they are held to be common carriers in some senses, they are limited in their rates of toll, for the transportation of persons and property, by the terms of the grant under which they exist. Whilst liable for loss or injury resulting from negligence, the property in process of transportation is always, either directly or indirectly, in the custody of others. In all these respects, the business of ferriage differs from that of ordinary commerce.

If we look at the nature of the tax, to determine whether it was within the power of the State to impose it, we find that the act taxes the capital stock not merely of corporations of domestic creation, but of all incorporated by any other State and doing business within the Commonwealth. As one-half of the bed of the river Delaware is subject to the jurisdiction of Pennsylvania, it follows as a geographical fact that a company employed in a ferriage across the entire stream is doing business within the Commonwealth, within the contemplation of the act ; and not being engaged in inter-State commerce, it is within the taxing power of the State. *Bank of Augusta* v. *Earle*, 13 Pet. 519. It results from the language of the court in *St. Louis* v. *Ferry Co.*, 11 Wall. 423, that a ferry company is

subjected to the same rules and liabilities as other corporations as to extra State business. It is, moreover, to be observed that the tax here sought to be imposed is not a tax upon the specific property of the corporation in which its capital may be invested. It is not an attempt to tax the ferry boats of this company, nor is it an effort to tax a corporation in proportion to the number of ferry boats it owns. The tax is not imposed either directly or indirectly upon them ; it is not measured in amount by their numbers; it is the same whether the company owns few or many of them, and is unaffected by the frequency of their use. It therefore clashes with none of the following decisions which form part of the judicial argument against its validity: *Cannon* v. *New Orleans*, 20 Wall. 577; 582 ; *Transportation Co.* v. *Wheeling*, 99 U. S. 273, 283, 284; *Morgan* v. *Parham*, 16 Wall. 471, 475, 476, 478 ; *Hays* v. *Pacific Mail Steamship Co.*, 17 How. 596; *Hoyt* v. *Commissioners of Taxation*, 23 N. Y. 224, 227. It is not a tax " on account of every passenger brought from a foreign country into the State ; " it is not measured by the number of passengers or in any way affected by them, and therefore does not contravene the doctrine of *The Passenger Cases*, 7 How. 283. It is not a tax upon a bill of lading, and therefore not within *Almy* v. *California*, 24 How. 169; nor is it a tax upon " passengers carried out of the State." *Crandell* v. *Nevada*, 6 Wall. 35. It is rather a tax upon the capital stock of the corporation, " not in separate parcels, as representing distinct properties, but as a homogeneous unit, partaking of the nature of personality," and taxable where its corporate functions are exercised or its business done. The franchise itself may constitute the material part of all its property, since not only its wharves and slips, but also its boats, might be leased, and, in that case, the tax would be measured by the value of the franchise represented by the extent of its exercise within the State, and not by its tangible property situated there. The extent of its property subject to the taxing power is immaterial. Its franchise would be worthless without the leasehold interest owned by it in the city of Philadelphia. The value of its franchise depends upon that leasehold, and it will, therefore, not do to say that it has no property

within the jurisdiction of the taxing power. It does not seem necessary to inquire further as to an ownership of property within the jurisdiction of Pennsylvania.

We do not deny that there is a wide distinction between transportation by water and transportation by land, but when it is sought, by that distinction, to explain the regulation and control of railroads by the States, we submit that the same distinction prevails between the business of ferriage and that of commerce, strictly defined, and that the same authority which regulates and controls the operations of railroads engaged in inter-State traffic, may also regulate and control the business of corporations exercising ferry franchises within her borders.

If the business of ferriage is commerce, as defined by Chief Justice Marshall, we concede that any tax laid upon such business, which comes within the ruling of the Passenger cases, or the State Freight Tax cases, or the many other cases involving the same principle, is an interference with commerce, and, for that reason, unconstitutional. But if the tax is not of the nature indicated by those cases, or if a ferry business is rather in aid of commerce than commerce itself, or is subject to the same exactions in respect to taxation as foreign railroad and other corporations engaged in inter-State traffic, then we submit that the tax is not an interference with commerce, nor repugnant to the Federal Constitution, and the judgment of the Supreme Court of Pennsylvania should, consequently, be affirmed.

MR. JUSTICE FIELD delivered the opinion of the court. He stated the facts as above recited, and continued:

The Supreme Court of the State, in giving its decision in this case, stated that the single question presented for consideration was whether the company did business within the State of Pennsylvania during the period for which the taxes were imposed; and it held that it did do business there because it landed and received passengers and freight at its wharf in Philadelphia, observing that its whole income was derived from the transportation of freight and passengers from its

wharf at Gloucester to its wharf at Philadelphia, and from its wharf at Philadelphia to its wharf at Gloucester; that at each of these points its main business, namely, the receipt and landing of freight and passengers, was transacted; that for such business it was dependent as much upon the one place as upon the other; that, as it could hold the wharf at Gloucester, which it owned in fee, only by purchase by virtue of the statutory will of the Legislature of New Jersey, so it could hold by lease the one in Philadelphia only by the implied consent of the Legislature of the Commonwealth; and that, therefore, it "was dependent equally, not only for its business, but its power to do that business, upon both States, and might, therefore, be taxed by both."  98 Penn. St. 105, 116.

As to the first reason thus expressed, it may be answered that the business of landing and receiving passengers and freight at the wharf in Philadelphia is a necessary incident to, indeed is a part of, their transportation across the Delaware River from New Jersey. Without it that transportation would be impossible. Transportation implies the taking up of persons or property at some point and putting them down at another. A tax, therefore, upon such receiving and landing of passengers and freight is a tax upon their transportation; that is, upon the commerce between the two States involved in such transportation.

It matters not that the transportation is made in ferry-boats, which pass between the States every hour of the day. The means of transportation of persons and freight between the States does not change the character of the business as one of commerce, nor does the time within which the distance between the States may be traversed. Commerce among the States consists of intercourse and traffic between their citizens, and includes the transportation of persons and property, and the navigation of public waters for that purpose, as well as the purchase, sale and exchange of commodities. The power to regulate that commerce, as well as commerce with foreign nations, vested in Congress, is the power to prescribe the rules by which it shall be governed, that is, the conditions upon which it shall be conducted; to determine when it shall be free

and when subject to duties or other exactions. The power also embraces within its control all the instrumentalities by which that commerce may be carried on, and the means by which it may be aided and encouraged. The subjects, therefore, upon which the power may be exerted are of infinite variety. While with reference to some of them, which are local and limited in their nature or sphere of operation, the States may prescribe regulations until Congress intervenes and assumes control of them; yet, when they are national in their character, and require uniformity of regulation affecting alike all the States, the power of Congress is exclusive. Necessarily that power alone can prescribe regulations which are to govern the whole country. And it needs no argument to show that the commerce with foreign nations and between the States, which consists in the transportation of persons and property between them, is a subject of national character, and requires uniformity of regulation. Congress alone, therefore, can deal with such transportation; its non-action is a declaration that it shall remain free from burdens imposed by State legislation. Otherwise, there would be no protection against conflicting regulations of different States, each legislating in favor of its own citizens and products, and against those of other States. It was from apprehension of such conflicting and discriminating State legislation, and to secure uniformity of regulation, that the power to regulate commerce with foreign nations and among the States was vested in Congress.

Nor does it make any difference whether such commerce is carried on by individuals or by corporations. *Welton* v. *Missouri*, 91 U. S. 275; *Mobile* v. *Kimball*, 102 U. S. 691. As was said in *Paul* v. *Virginia*, 8 Wall. 168, at the time of the formation of the Constitution, a large part of the commerce of the world was carried on by corporations; and the East India Company, the Hudson Bay Company, the Hamburgh Company, the Levant Company, and the Virginia Company were mentioned as among the corporations which, from the extent of their operations, had become celebrated throughout the commercial world. The grant of power is general in its terms, making no reference to the agencies by which commerce may be carried on.

It includes commerce by whomsoever conducted, whether by individuals or by corporations. At the present day, nearly all enterprises of a commercial character, requiring for their successful management large expenditures of money, are conducted by corporations. The usual means of transportation on the public waters, where expedition is desired, are vessels propelled by steam; and the ownership of a line of such vessels generally requires an expenditure exceeding the resources of single individuals. Except in rare instances, it is only by associated capital furnished by persons united in corporations, that the requisite means are provided for such expenditures.

As to the second reason given for the decision below, that the company could not lease its wharf in Philadelphia except by the implied consent of the Legislature of the Commonwealth, and thus is dependent upon the Commonwealth to do its business, and therefore can be taxed there, it may be answered that no foreign or inter-State commerce can be carried on with the citizens of a State without the use of a wharf, or other place within its limits on which passengers and freight can be landed and received, and the existence of power in a State to impose a tax upon the capital of all corporations engaged in foreign or inter-State commerce for the use of such places would be inconsistent with and entirely subversive of the power vested in Congress over such commerce. Nearly all the lines of steamships and of sailing vessels between the United States and England, France, Germany and other countries of Europe, and between the United States and South America, are owned by corporations; and if by reason of landing or receiving passengers and freight at wharves, or other places in a State, they can be taxed by the State on their capital stock on the ground that they are thereby doing business within her limits, the taxes which may be imposed may embarrass, impede, and even destroy such commerce with the citizens of the State. If such a tax can be levied at all, its amount will rest in the discretion of the State. It is idle to say that the interests of the State would prevent oppressive taxation. Those engaged in foreign and inter-State commerce are not bound to trust to its moderation in that respect; they require

security. And they may rely on the power of Congress to prevent any interference by the State until the act of commerce, the transportation of passengers and freight, is completed. The only interference of the State with the landing and receiving of passengers and freight, which is permissible, is confined to such measures as will prevent confusion among the vessels, and collision between them, insure their safety and convenience, and facilitate the discharge or receipt of their passengers and freight, which fall under the general head of port regulations, of which we shall presently speak.

It is true that the property of corporations engaged in foreign or inter-State commerce, as well as the property of corporations engaged in other business, is subject to State taxation, provided always it be within the jurisdiction of the State. As said by Chief Justice Marshall in *McCulloch* v. *Maryland*, 4 Wheat. 316, 429, "all subjects over which the sovereign power of a State extends are objects of taxation; but those over which it does not extend are, upon the soundest principles, exempt from taxation. This proposition may almost be pronounced self-evident."

In *Hays* v. *Pacific Mail Steamship Co.*, 17 How. 596, the defendant, a corporation of New York, owned steam vessels employed in the transportation of passengers and freight between New York and San Francisco, and between New York and different ports in Oregon, which were registered in New York. The principal office of the company for transacting its business was also in New York, though for its better management agencies were established in Panama and in San Francisco. It had a naval dock and ship yard at Benicia, in California, for furnishing and repairing its steamers. On their arrival at the port of San Francisco they remained only long enough to land their passengers, mail, and freight, which was usually done in a day, and then proceeded to Benicia, where they remained for repairs and refitting until the commencement of the next voyage, which was generally some ten or twelve days. It was held that the vessels were not subject to taxation in California, as they were only temporarily there while engaged in lawful trade and commerce; that their *situs*

was at their home port, where their owners were liable to be taxed for the capital invested. The court, in giving its decision, said that the ships are "engaged in the business and commerce of the country, upon the highway of nations, touching at such ports and places as these great interests demand, and which hold out to the owners sufficient inducements by the profits realized or expected to be realized. And so far as respects the ports and harbors within the United States, they are entered and cargoes discharged or laden on board, independently of any control over them, except as it respects such municipal and sanitary regulations of the local authorities as are not inconsistent with the Constitution and laws of the general government, to which belongs the regulation of commerce with foreign nations and between the States. Now, it is quite apparent that if the State of California possessed the authority to impose the tax in question, any other State in the Union, into the ports of which the vessels entered in the prosecution of their trade and business, might also impose a like tax."

In *Morgan* v. *Parham*, 16 Wall. 471, it was held that a vessel registered in New York was not subject to taxation in Alabama, though engaged in commerce as one of a regular line of steamers between Mobile in that State and New Orleans in Louisiana. In rendering the decision it was said: "It is the opinion of the court that the State of Alabama had no jurisdiction over this vessel for the purpose of taxation, for the reason that it had not become incorporated into the personal property of that State, but was there temporarily only, and that it was engaged in lawful commerce between the States, with its *situs* at the home port of New York, where it belonged, and where its owner was liable to be taxed for its value," referring to the case of *Hays* v. *Pacific Mail Steamship Co.* as decisive of the case, and adding: "The jurisdiction of this court over the present case, as in the case of *Hays* v. *The Pacific Mail Steamship Co.*, arises from the facts, first, that the property had not become blended with the business and commerce of Alabama, but remained legally of and as in New York; and, secondly, that the vessel was lawfully engaged in the inter-State trade.

over the public waters.   It is in law as if the vessel had never before or after that day been within the port of Mobile, but, touching there on a single occasion when engaged in the inter-State trade, had been subjected to a tax as personal property of that city.   Within the authorities it is an interference with the commerce of the country not permitted to the States."

In *St. Louis* v. *The Ferry Co.*, 11 Wall. 423, the company was incorporated by Illinois to run a ferry from a place opposite St. Louis to that city across the Mississippi.   It had its principal place of business in St. Louis, in which its chief officers resided, and there the business meetings of its directors were held..   Its engineers and subordinate officers resided in Illinois, where its real estate was situated.   Its ferry boats, when not in use, were laid up in Illinois and forbidden to remain at the wharf in St. Louis.   It paid a ferry license to St. Louis and a wharfage tax for the use of its wharf there.   In addition to these charges the city authorities assessed a tax on the company for the value of the boats as property *within the city*, all property within it being taxable under a statute of the State.   The court held that the tax was illegally levied, as the boats were not property within the city, and said : " Where there is jurisdiction neither as to person nor property, the imposition of a tax would be *ultra vires* and void.   If the Legislature of a State should enact that the citizens or property of another State or country should be taxed in the same manner as the persons and property within its own limits and subject to its authority, or in any other manner whatsoever, such a law would be as much a nullity as if in conflict with the most explicit constitutional inhibition. . Jurisdiction is as necessary to valid legislative as to valid judicial action."

In *Railroad Co.* v. *Pennsylvania*, 15 Wall. 300, sometimes called " Case of State tax on foreign-held bonds," which was brought here on a writ of error to the Supreme Court of the State, this court said that " the power of taxation, however vast in its character and searching in its extent, is necessarily limited to subjects within the jurisdiction of the State.   These subjects are persons, property, and business."   This proposition would seem, as stated by Chief Justice Marshall, to be

self-evident, and no force of expression could add to its manifest truth.

In the recent case of *Commonwealth of Pennsylvania* v. *Standard Oil Co.*, 101 Penn. St. 119, the liability of foreign corporations doing business within that State is elaborately considered by its Supreme Court. The corporation was doing business there, and it was contended on the part of the Commonwealth that the tax should be imposed upon all of the capital stock of the company; while on the other side it was urged that only so much of the stock was intended, by the statute, to be taxed as was represented by property of the company invested and used in the State. In giving its decision the court said that it had been repeatedly decided and was settled law that a tax upon the capital stock of a company is a tax upon its property and assets (citing to that effect a large number of decisions); that it was undoubtedly competent for the legislature to lay a franchise or license tax upon foreign corporations for the privilege of doing business within the State, but that the tax in that case was in no sense a license tax; that the State had never granted a license to the Standard Oil Company to do business there, but merely taxed its property, that is, its capital stock, to the extent that it brought such property within its borders in the transaction of its business; that the position of the Commonwealth, that a foreign corporation entering the State to do business brought its entire capital, was ingenious but unsound; that it was a fundamental principle that, in order to be taxed, the person must have a domicil in the State, and the thing must have a *situs* therein; that persons and property in transitu could not be taxed; that the domicil of a corporation was in the State of its origin, and it could not emigrate to another sovereignty; that the domicil of the Standard Oil Company was in Ohio, and when it sent its agents into the State to transact business it no more entered the State in point of fact than any other foreign corporation, firm, or individual who sent an agent there to open an office or branch house, nor brought its capital there constructively; that it would be as reasonable to assume that a business firm in Ohio brought its entire capital there because it sent its agent

VOL. CXIV—14

to establish a branch of its business, as to hold that the Standard Oil Company, by employing certain persons in the State to transact a portion of its business, thereby brought all its property or capital stock within the jurisdiction of the State; that there was neither reason nor authority for such a proposition; that the company was taxable only to the extent that it brought its property within the State; and that its capital stock, as mentioned in the act of the legislature, must be construed to mean so much of the capital stock as was measured by the property actually brought within the State by the company in the transaction of its business. The justice who delivered the opinion of the court added, speaking for himself, that he conceded the power of the Commonwealth to exclude foreign corporations altogether from her borders, or to impose a license tax so heavy as to amount to the same thing; but he denied, great and searching as her taxing power is, that she could tax either persons or property not within her jurisdiction. "A foreign corporation," he said, "has no domicil here, and can have none; hence it cannot be said to draw to itself the constructive possession of its property located elsewhere. There are a large number of foreign insurance companies doing business here under license from the State. Some of them have a very large capital. It is usually invested at the domicil of the company. If the position of the Commonwealth is correct, she can tax the entire property of the Royal Insurance Company, although the same is located almost wholly in England, or the assets of the New York Mutual, located in New York."

Under this decision there is no property held by the Gloucester Ferry Company which can be the subject of taxation in Pennsylvania, except the lease of the wharf in that State. Whether that wharf is taxed to the owner or to the lessee it matters not, for no question here is involved in such taxation. It is admitted that it could be taxed by the State according to its appraised value. The ferry-boats of the company are registered at the port of Camden in New Jersey, and according to the decisions in *Hays* v. *The Pacific Mail Steamship Co.*, and in *Morgan* v. *Parham*, they can be taxed only at their home port. According to the decision in the Standard Oil Company

case, and by the general law on the subject, the company has no domicil in Pennsylvania, and its capital stock representing its property is held outside of its limits. It is solely, therefore, for the business of the company in landing and receiving passengers at the wharf in Philadelphia that the tax is laid, and that business, as already said, is an essential part of the transportation between the States of New Jersey and Pennsylvania, which is itself inter-State commerce. While it is conceded that the property in a State belonging to a foreign corporation engaged in foreign or inter-State commerce may be taxed equally with like property of a domestic corporation engaged in that business, we are clear that a tax or other burden imposed on the property of either corporation because it is used to carry on that commerce, or upon the transportation of persons or property, or for the navigation of the public waters over which the transportation is made, is invalid and void as an interference with, and an obstruction of, the power of Congress in the regulation of such commerce. This proposition is supported by many adjudications. Thus, in *Gibbons* v. *Ogden*, 9 Wheat. 1, the earliest and leading case upon the commercial power of Congress, it was held that the acts of New York giving to Livingston and Fulton the exclusive right, for a certain number of years, to navigate all the waters within its jurisdiction with vessels propelled by steam, were unconstitutional and void. Making the navigation of those waters subject to a license of the grantees of the State, that is, to such a tax or other burden as they might levy, was an obstruction to commerce between the States and in conflict with the laws of Congress respecting the coasting trade. Although the sole point in judgment was whether the State could regulate commerce on her waters in the face of such legislation by Congress, yet the argument of the court was that such attempted control of the navigable waters of the State was an encroachment upon the power of Congress, independently of that legislation.

In *Steamship Co.* v. *Port Wardens*, 6 Wall. 31, it was held that a statute of Louisiana, declaring that the master and wardens of the port of New Orleans should be entitled to demand and receive, in addition to other fees, the sum of five

dollars for every vessel arriving at that port, whether called on to perform any service or not, was unconstitutional and void, as imposing a burden upon commerce, both inter-State and foreign. The exaction was, in effect, a tax for entering the port, that is, for the navigation of its waters. The control of the navigable waters of the port, and of all public waters constituting channels of communication between the States and foreign countries, is embraced within the commercial power of Congress, and equally beyond the interference of the States. It was claimed that the tax was for compensation to the master and wardens for the performance of certain duties required of them, and that the law for its collection stood, therefore, on the same constitutional grounds as the laws authorizing the collection of pilotage; but the court answered that no acts of Congress recognize such laws as that of Louisiana as proper and beneficial regulations, whilst State laws in respect to pilotage are thus recognized. The court also added, that the right to recover pilotage and half-pilotage, prescribed by State legislation, rested not only upon State laws, but upon contract, observing that pilotage was compensation for services performed and half-pilotage was compensation for services which a pilot had put himself in readiness to perform by labor, risk, and cost, and had offered to perform; whilst in the case of Louisiana the State law subjected the vessel to the demand of the master and wardens, whether called upon to perform any service or not. The case, therefore, was simply one of a tax imposed upon the vessel for the navigation of the public waters of the State, and, as such, was a regulation of commerce, and an illegal encroachment upon the power of Congress.

In *Reading Railroad Co.* v. *Pennsylvania*, sometimes called the *Case of the State Freight Tax*, 15 Wall. 232, it was held that the act of the Legislature of Pennsylvania requiring railroad companies to pay to the State Treasurer, for the use of the Commonwealth, a tax on each two thousand pounds of freight carried, was unconstitutional and void, so far as it affected commodities transported through the State, or from points without the State to points within the State, or from points within the State to points without it, as being a regula-

tion of inter-State commerce. The court said that the imposition of the tax, whether large or small, was a restraint upon the privilege or right to have the subjects of commerce passed freely from one State to another without being obstructed by the intervention of State lines. Its payment was a condition upon which the prosecution of that branch of commerce was made to depend, and its imposition therefore was in conflict with the power of Congress over the subject.

In *Henderson* v. *the Mayor of New York*, 92 U. S. 259, an act of the State of New York requiring the owner or consignee of a vessel arriving at the port of New York to give a bond for every passenger in a penalty of $300, with two sureties, each a resident and freeholder, conditioned to indemnify the Commissioners of Emigration, and every county, city and town in the State, against any expense for the relief or support of the person named in the bond, for four years thereafter, but allowing in commutation of the bond a payment of one dollar and a half for each passenger within twenty-four hours after his landing, and imposing a penalty of $500 for each passenger if such payment were not made within that time, the penalty to be a lien upon the vessel, was held to be unconstitutional and void. In its decision the court said that the State imposed a tax on the ship-owner for the right to land his passengers, and that it was in effect a tax on the passenger himself, since its payment was required as part of his fare. "The transportation of a passenger from Liverpool to the city of New York," it added, speaking by Mr. Justice Miller, "is one voyage. It is not completed until the passenger is disembarked at the pier in the latter city. A law or rule emanating from any lawful authority which prescribes terms or conditions on which alone the vessel can discharge its passengers, is a regulation of commerce, and, in case of vessels and passengers coming from foreign ports, is a regulation of commerce with foreign nations." 92 U. S. 259, 271.

These cases would seem to be decisive of the character of the business which is the subject of taxation in the present case. Receiving and landing passengers and freight is incident to their transportation. Without both there could be no such

thing as their transportation across the river Delaware. The transportation, as to passengers, is not completed until, as said in the Henderson case, they are disembarked at the pier of the city to which they are carried; and, as to freight, until it is landed upon such pier. And all restraints by exactions in the form of taxes upon such transportation, or upon acts necessary to its completion, are so many invasions of the exclusive power of Congress to regulate that portion of commerce between the States.

The cases where a tax or toll upon vessels is allowed to meet the expenses incurred in improving the navigation of waters traversed by them, as by the removal of rocks, the construction of dams and locks to increase the depth of water and thus extend the line of navigation, or the construction of canals around falls, rest upon a different principle. The tax in such cases is considered merely as compensation for the additional facilities thus provided in the navigation of the waters. *Kellogg* v. *Union Co.*, 12 Conn. 7; *Thames Bank* v. *Lovell*, 18 Conn. 500; *McReynolds* v. *Smallhouse*, 8 Bush, 447.

Upon similar grounds, what are termed harbor dues or port charges, exacted by the State from vessels in its harbors, or from their owners, for other than sanitary purposes, are sustained. We say for other than sanitary purposes; for the power to prescribe regulations to protect the health of the community, and prevent the spread of disease, is incident to all local municipal authority, however much such regulations may interfere with the movements of commerce. But, independently of such measures, the State may prescribe regulations for the government of vessels whilst in its harbors; it may provide for their anchorage or mooring, so as to prevent confusion and collision; it may designate the wharves at which they shall discharge and receive their passengers and cargoes, and require their removal from the wharves when not thus engaged, so as to make room for other vessels. It may appoint officers to see that the regulations are carried out, and impose penalties for refusing to obey the directions of such officers; and it may impose a tax upon vessels sufficient to meet the expenses attendant upon the execution of the regulations. The authority for establishing

regulations of this character is found in the right and duty of the supreme power of the State to provide for the safety, convenient use and undisturbed enjoyment of property within its limits; and charges incurred in enforcing the regulations may properly be considered as compensation for the facilities thus furnished to the vessels. *Vanderbilt* v. *Adams*, 7 Cowen, 349, 351. Should such regulations interfere with the exercise of the commercial power of Congress, they may at any time be superseded by its action. It was not intended, however, by the grant to Congress to supersede or interfere with the power of the States to establish police regulations for the better protection and enjoyment of property. Sometimes, indeed, as remarked by Mr. Cooley, the line of distinction between what constitutes an interference with commerce and what is a legitimate police regulation is exceedingly dim and shadowy, and he adds: " It is not doubted that Congress has the power to go beyond the general regulations of commerce which it is accustomed to establish, and to descend to the most minute directions if it shall be deemed advisable, and that to whatever extent ground shall be covered by those directions, the exercise of State power is excluded. Congress may establish police regulations as well as the States, confining their operations to the subjects over which it is given control by the Constitution; but as the general police power can better be exercised under the provisions of the local authority, and mischiefs are not likely to spring therefrom so long as the power to arrest collision resides in the National Congress, the regulations which are made by Congress do not often exclude the establishment of others by the State covering very many particulars." Cooley's Constitutional Limitations, 732.

The power of the States to regulate matters of internal police includes the establishment of ferries as well as the construction of roads and bridges. In *Gibbons* v. *Ogden*, Chief Justice Marshall said that laws respecting ferries, as well as inspection laws, quarantine laws, health laws, and laws regulating the internal commerce of the States, are component parts of an immense mass of legislation, embracing everything within the limits of a State not surrendered to the general government;

but in this language he plainly refers to ferries entirely within the State, and not to ferries transporting passengers and freight between the States and a foreign country; for the power vested in Congress, he says, comprehends every species of commercial intercourse between the United States and foreign countries. No sort of trade, he adds, can be carried on between this country and another to which the power does not extend; and what is true of foreign commerce is also true of commerce between States over the waters separating them. Ferries between one of the States and a foreign country cannot be deemed, therefore, beyond the control of Congress under the commercial power. They are necessarily governed by its legislation on the importation and exportation of merchandise and the immigration of foreigners, that is, are subject to its regulation in that respect; and if they are not beyond the control of the commercial power of Congress, neither are ferries over waters separating States. Congress has passed various laws respecting such international and inter-State ferries, the validity of which is not open to question. It has provided that vessels used exclusively as ferry-boats, carrying passengers, baggage and merchandise, shall not be required to enter and clear, nor shall their masters be required to present manifests, or to pay entrance or clearance fees, or fees for receiving or certifying manifests; "but they shall, upon arrival in the United States, be required to report such baggage and merchandise to the proper officer of the customs according to law," Rev. Stat. § 2792; that the lights for ferry-boats shall be regulated by such rules as the Board of Supervising Inspectors of Steam Vessels shall prescribe, Rev. Stat. § 4233, Rule 7; that any foreign railroad company or corporation, whose road enters the United States by means of a ferry or tug-boat, may own such boat, and that it shall be subject to no other or different restrictions or regulations in such employment than if owned by a citizen of the United States, Rev. Stat. § 4370; that the hull and boilers of every ferry-boat propelled by steam shall be inspected, and provisions of law for the better security of life, which may be applicable to them, shall, by regulations of the supervising inspectors, be required to be complied with

before a certificate of inspection be granted; and that they shall not be navigated without a licensed engineer and a licensed pilot, Rev. Stat. § 4426.

It is true that, from the earliest period in the history of the government, the States have authorized and regulated ferries, not only over waters entirely within their limits, but over waters separating them; and it may be conceded that in many respects the States can more advantageously manage such inter-State ferries than the general government; and that the privilege of keeping a ferry, with a right to take toll for passengers and freight, is a franchise grantable by the State, to be exercised within such limits and under such regulations as may be required for the safety, comfort and convenience of the public. Still the fact remains that such a ferry is a means, and a necessary means, of commercial intercourse between the States bordering on their dividing waters, and it must, therefore, be conducted without the imposition by the States of taxes or other burdens upon the commerce between them. Freedom from such impositions does not, of course, imply exemption from reasonable charges, as compensation for the carriage of persons, in the way of tolls or fares, or from the ordinary taxation to which other property is subjected, any more than like freedom of transportation on land implies such exemption. Reasonable charges for the use of property, either on water or land, are not an interference with the freedom of transportation between the States secured under the commercial power of Congress. *Packet Co.* v. *Keokuk,* 95 U. S. 80; *Packet Co.* v. *St. Louis,* 100 U. S. 423; *Vicksburg* v. *Tobin,* 100 U. S. 430; *Packet Co.* v. *Catlettsburg,* 105 U. S. 559; *Transportation Co.* v. *Parkersburg,* 107 U. S. 691. That freedom implies exemption from charges other than such as are imposed by way of compensation for the use of the property employed, or for facilities afforded for its use, or as ordinary taxes upon the value of the property. How conflicting legislation of the two States on the subject of ferries on waters dividing them is to be met and treated is not a question before us for consideration. Pennsylvania has never attempted to exercise its power of establishing and regulating ferries across the Dela-

ware River. Any one, so far as her laws are concerned, is free, as we are informed, to establish such ferries as he may choose. No license fee is exacted from ferry-keepers. She merely exercises the right to designate the places of landing, as she does the places of landing for all vessels engaged in commerce. The question, therefore, respecting the tax in the present case is not complicated by any action of that State concerning ferries. However great her power, no legislation on her part can impose a tax on that portion of inter-State commerce which is involved in the transportation of persons and freight, whatever be the instrumentality by which it is carried on.

It follows that upon the case stated the tax imposed upon the ferry company was illegal and void.

*The judgment of the Supreme Court of the State of Pennsylvania must, therefore, be reversed and the cause remanded for further proceedings in conformity with this opinion.*