NEW YORK CENTRAL AND HUDSON RIVER RAILROAD COMPANY v. THE BOARD OF CHOSEN FREEHOLDERS OF THE COUNTY OF HUDSON.

Argued November 12, 1906—Decided February 25, 1907.

1. The act of February 6th, 1799 (*Gen. Stat., p.* 1469), does not suffice to authorize the chosen freeholders of Hudson county to fix the rates of ferriage of foot passengers from New Jersey to New York.
2. The regulation of rates of ferriage of foot passengers across the Hudson river from New Jersey to New York is a regulation of interstate commerce and beyond the power of New Jersey under the federal constitution.
3. The power of congress over interstate commerce is paramount, and has been exercised by the act to regulate commerce of February 4th, 1887.
4. *Chosen Freeholders of Hudson* v. *State,* 4 *Zab.* 718, distinguished.

---

On *certiorari.*

Before Justices HENDRICKSON, SWAYZE and TRENCHARD.

For the prosecutors, *Albert C. Wall (James B. Vredenburgh* and *Thomas Emory,* of the New York bar, on his brief).

For the defendants, *John Griffin.*

The opinion of the court was delivered by

SWAYZE, J. This case involves the validity of resolutions of the board of chosen freeholders of the county of Hudson fixing the rates of ferriage for the transportation of foot passengers between the county of Hudson and the State of New York. One resolution fixes the rate of ferriage for the round trip, and the other for the trip from New Jersey to New York. The action of the board of freeholders was taken under the authority of the act of February 6th, 1799. *Gen. Stat., p: 1469.*

The proofs show that the ferry-boats are run to connect with trains on various railroads running through New Jersey from points in the State of New York to a terminal station at Weehawken, and are used by passengers on the railroads to and from New York. They are used, also, by persons not passengers on the railroads for the purpose of crossing the Hudson river from Hudson county to the city of New York.

. The resolutions are not in terms limited to the latter class of persons. Foot passengers may mean those who arrive at Weehawken by rail from points outside of the State of New Jersey and enter the ferry from the railroad station, as well as those who enter from Weehawken without having been passengers on the railroads. The natural construction of the resolutions does not limit their application to foot passengers from Hudson county; the words "from Hudson county" evidently relate to the transportation, and do not seem intended to qualify the class of passengers. If this is the proper construction, the resolutions certainly are a regulation of interstate commerce, at least as to the rate of ferriage for passengers destined from points out of New Jersey to New York, or from New York to points out of New Jersey. The transportation of passengers is commerce as much as the transportation of goods. *Gibbons* v. *Ogden,* 9 *Wheat.* 1; *Passenger Cases, 7 How.* 283. Such regulations of that commerce are beyond the power of the state. *Wabash, St. Louis and Pacific Railway Co.* v. *Illinois,* 118 *U. S.* 557.

Assuming, however, that the only object of the resolutions was to regulate ferriage from Hudson county of persons not

passengers by rail, we have still to inquire whether they are within the power of the freeholders, in view of the commerce clause of the federal constitution.

The authority of the freeholders was sustained by the Court of Errors and Appeals in *Chosen Freeholders of Hudson* v. *State,* 4 *Zab.* 718, decided in 1853, and this case is relied upon by the defendants. It differs, however, materially from the present case. The attempt there was to regulate the rates of ferriage to be taken at the ferry in Jersey City, and the Supreme Court and Court of Errors and Appeals sustained the regulation upon the theory that the ferry meant the wharf and establishment set up at the terminus within this state (3 *Id.* 212; 4 *Id.* 722, 724), where Judge Elmer drew the distinction between a ferry establishment and the way across the water. Both in the Supreme Court and Court of Errors and Appeals it was recognized that the power of New Jersey was limited by the state line, and did not extend so far as to permit the regulation of rates within the boundaries of New York. The resolutions now before us purport to regulate the entire cost of transportation across the river. There is an obvious difference between fixing a rate to be taken at the ferry in Jersey City, which leaves it open for New York to fix a rate on its side of the river and for the owner of the ferry to charge the sum of the two rates for transportation, and fixing a rate which shall be operative in the jurisdiction of another state.

Another distinction is that in the former case the ferry seems, from the report, to have been distinct from the railroad, although it was kept by the railroad company. It is common knowledge that there has been a great development and change in this respect in the last fifty years, and in the present case the ferry, instead of being separate and distinct from the railroad, is in fact a continuation thereof, forming a necessary link in the line of communication between the city of New York and other portions of the State of New York.

Not only is the case of Chosen Freeholders of Hudson *v.* State distinguishable from the present, but its authority has

been greatly shaken by a subsequent decision of our own court eleven years later. *Erie Railway* v. *State,* 2 *Vroom* 531. That case involved the power of New Jersey to impose a tax on goods in transit across the state. In the Supreme Court the tax was sustained, and Chosen Freeholders of Hudson *v.* State was relied on as authority. *State* v. *Delaware, Lackawanna and Western Railroad Co.,* 1 *Id.* 473. The judgment was reversed and an opinion delivered by Chief Justice Beasley which ignored entirely the older case. The failure of the Chief Justice to refer to the case is most significant. If Chosen Freeholders of Hudson *v.* State is an authority in favor of the right to regulate the rate for the transportation across the river, it is difficult to see why the same principle would not permit New Jersey to impose a tax upon goods in transit. The case was pointedly called to the attention of the Court of Errors and Appeals by the opinion of the Supreme Court, and the fact that it was ignored by the Chief Justice indicates either that he did not consider it an authority for the broad proposition above stated, or that he intentionally disregarded it. In either view, its binding force upon us is, to say the least, much weakened.

Since, however, the question raised in the present case involves the power of the state under the federal constitution, our Court of Errors and Appeals is not the court of last resort. For an authoritative decision we must look to the Supreme Court of the United States. Questions similar to the one before us have frequently arisen and been much debated since 1853. It would not help the discussion to refer to the numerous cases, and we confine ourselves to those which relate directly to ferries. We find it convenient to state them in chronological order.

In *Fanning* v. *Gregoire,* 16 *How.* 524, decided in 1853, Fanning claimed an exclusive right, under an act of the legislature of the territory of Iowa, to maintain a ferry across the Mississippi river at Dubuque for twenty years. Before the twenty years had expired, the city of Dubuque, acting under the authority of its charter, granted a license to Gregoire for a ferry at the same place. Thereupon Fanning filed a bill for

injunction, which was denied. The question of the effect of the power of congress over interstate commerce was touched upon only incidentally by the court, and it was held that this power did not interfere with the police power of the state in granting ferry licenses.

In 1862 the case of *Conway* v. *Taylor,* 1 *Black* 603, was decided. In that case Taylor claimed a ferry franchise across the Ohio river from Kentucky to Ohio. Conway and his associates undertook to establish a ferry at the same point, and obtained a ferry license under the laws of Ohio. The Court of Appeals of Kentucky held that the exclusive right of ferrying from the Kentucky side was in Taylor, but that the lower court was wrong in enjoining Conway from ferrying passengers from the Ohio side of the river. The decree of the Kentucky Court of Appeals was affirmed. The extent to which the court went is shown by the following extracts from the opinion of Mr. Justice Swayne: "There has been now nearly three-quarters of a century of practical interpretation of the constitution. During all that time, as before the constitution had its birth, the states have exercised the power to establish and regulate ferries; congress never. We have sought in vain for any act of congress which involves the exercise of this power. That the authority lies within the scope of that immense mass of undelegated powers which are reserved to the states respectively we think too clear to admit of doubt. We place our judgment wholly upon that ground." He also said: "Undoubtedly the states in conferring ferry rights may pass laws so infringing the commercial power of the nation that it would be the duty of this court to annul or control them. The function is one of extreme delicacy, and only to be performed where the infraction is clear. The ferry laws in question in this case are not of that character."

In 1883 *Wiggins Ferry Co.* v. *East St. Louis,* 107 *U. S.* 365, was decided, and it was held that the city of East St. Louis, in Illinois, might impose a license fee upon a ferry company for each boat plying between that city and the Missouri side of the river. The tax was sustained as an exercise

of the police power, upon the authority of *Fanning v. Gre-goire* and *Conway v. Taylor.*

In 1885 *Gloucester Ferry Co. v. Pennsylvania,* 114 U. S. 196, was decided, and it was held that the State of Pennsylvania could not impose a tax upon the capital stock of the Gloucester Ferry Company, a corporation of New Jersey, engaged in the transportation of persons and property between Gloucester and Philadelphia. It was sought to sustain the tax because the ferry company landed and received passengers and freight at its wharf in Philadelphia, and was therefore doing business within the State of Pennsylvania, but the court said that the business of receiving passengers and freight at the wharf in Philadelphia "is a necessary incident to—indeed, is part of—their transportation across the Delaware river from New Jersey. Without it that transportation would be impossible. Transportation implies the taking up of persons or property at some point and putting them down at another. A tax, therefore, upon such receiving and landing of passengers and freight is a tax upon their transportation; that is, upon the commerce between the two states involved in such transportation." Justice Field added: "It needs no argument to show that the commerce with foreign nations and between the states, which consists in the transportation of persons and property between them, is a subject of national character, and requires uniformity of regulation. Congress alone, therefore, can deal with such transportation. Its non-action is a declaration that it shall remain free from burdens imposed by state legislation. Otherwise there would be no protection against conflicting regulations of different states, each legislating in favor of its own citizens and products and against those of other states. It was from apprehension of such conflicting and discriminating state legislation and to secure uniformity of regulation that the power to regulate commerce with foreign nations and among the states was vested in congress."

In 1894, in *Covington and Cincinnati Bridge Co. v. Kentucky,* 154 U. S. 204, it was held by a majority of the court that an act of Kentucky regulating the tolls over a bridge

across the Ohio river between Covington and Cincinnati was invalid because it was an attempted regulation of interstate commerce. The bridge was held to be an instrument of commerce in the same sense as a ferry, and the Gloucester Ferry Company case was relied upon as authority. Throughout the opinion ferries and bridges are treated as governed by the same rule in this respect, and the argument suggested by Justice Field, in the Gloucester Ferry Company case, that the regulations of the two states might conflict, and that congress alone could harmonize the differences and enact a uniform scale of charges to be operative in both directions, was very much relied upon. The minority of the court, while concurring in the result, took a somewhat narrower view, and held that the several states had power to establish and regulate ferries and bridges, and the rates of toll thereon, whether within one state or between two adjoining states, subject to the paramount authority of congress over interstate commerce, but they reached the same result as the majority, for the reason that the acts of Ohio and Kentucky for the incorporation of the bridge company constituted a contract between the corporation and both states, which could not be altered by the one state without the consent of the other.

The whole subject was reviewed in the recent case of *St. Clair County* v. *Interstate Transfer Co.,* 192 *U. S.* 454, decided in 1904. That case, however, did not. involve the question now in controversy, for it was held that the traffic of the defendant did not constitute a ferry in the strict technical sense of the transportation of persons with or without property, since the transportation by the Interstate Transfer Company was of railroad cars only. The court was, however, careful to say: "Because we have, *arguendo,* rested our conclusion in this case upon the assumption that the respective states have the power to regulate ferries over navigable rivers constituting boundaries between states, we must not be understood as deciding that that doctrine, which undoubtedly finds support in the opinions announced in Fanning *v.* Gregoire and Conway *v.* Taylor, has not been modified by the rule subsequently laid down in the Gloucester

ferry case and the Covington bridge case. As this case has
not required us to enter into those considerations, we have
not done so."

· Whether these cases are consistent with each other is not
for us to decide. It may be that the establishment of
ferries, in the narrow sense of the word, and the licensing of
·the boats, are an exercise of the police power of the states,
and the regulation of the rates of ferriage a regulation of
commerce. It is enough for our present purpose that the
later decisions consistently deny the power attempted to be
exercised by the states. We are unable to distinguish the
regulation of rates for ferriage from the regulation of tolls
on a bridge. A ferry-boat is quite as much an instrument of
commerce as a bridge, and it was so treated in Covington and
Cincinnati Bridge Co. v. Kentucky. This case is binding
on us as an authoritative interpretation of the federal con-
stitution, and we think is itself sufficient to settle the present
controversy. But in view of the suggestions of the opinion
of the Supreme Court of the United States in St. Clair
County v. Interstate Transfer Company, we have considered
the case in the light of reason as well as of authority. The
reasons which led the Court of Errors and Appeals to declare
invalid the tax on goods in transit apply with greater force
to the rates for ferriage across an interstate river, since the ·
power of taxation may be exercised entirely within the limits
of the state, while the regulation of rates for ferriage across
an interstate river necessarily extends beyond the state line.
If one state has power to fix such rates, it may fix them so
as to obtain an advantage over its sister state; and since that
state must have the same power, the effect would be to bring
about the very conflict between states which the federal con-
stitution was meant to prevent, as was so well said by Chief
Justice Beasley, in the case already referred to. Indeed,
Judge Elmer, in Chosen Freeholders of Hudson·v. State, as
we already said, did not go so far as to "attempt to vindicate
the right of New Jersey to regulate beyond its own boun-
dary. That case, and the other cases above cited, that upheld
the state legislation as an exercise of police power, rests upon

grounds not applicable to the case before us. In Conway *v.* Taylor, the court expressly said that a ferry was in respect of the landing place, and not of the water; the water might be to one and the ferry to another; and that the franchise was confined to the transit from the shore of the state. The same view of a ferry was taken in *Columbia Delaware Bridge Co.* v. *Geisse,* 9 *Vroom* 39; *affirmed, Id.* 580, in which case, however, the court had to deal only with a ferry franchise.

There is nothing in these cases inconsistent with our present conclusion. The resolutions before us attempt to do more than regulate the transit from the shore of New Jersey; one seeks to regulate the cost of transportation to the shore of New York; the other to regulate the cost for the round trip. The latter resolution is inconsistent even with Conway *v.* Taylor, which conceded that Kentucky could not regulate a ferry from the Ohio shore, and both resolutions belong to the class of laws which Justice Swayne, in that case, said might so infringe the commercial power of the nation that it would be the duty of the court to annul or control them.

The argument based upon the view that a ferry means merely the landing place is not applicable to a situation like the present, where the ferry is a mere link in a great line of communication. Even if this link be a ferry in that sense, the regulation of rates of ferriage necessarily is a regulation of interstate commerce. The rates to be charged through passengers by rail must be influenced by the remunerative or unremunerative character of the local traffic. If the rates fixed by the freeholders be limited to local traffic and prove unremunerative, the loss must be made up at the expense of the through traffic; if the rates prove profitable, the rates for through traffic may be less.

If we concede that the resolutions are no more than an exercise of the police power, we are even then met by a serious difficulty. By the treaty between New York and New Jersey (*Gen. Stat., p.* 3464), New York is given exclusive jurisdiction over the waters of the Hudson river to the low-water mark on the New Jersey shore, subject to the right of property of New Jersey to the land under water west of the

middle of the river, and to the exclusive jurisdiction of New Jersey over the wharves, docks and improvements on its shore, and all vessels aground on that shore or fastened to such wharves or docks, and subject to the exclusive right of New Jersey to regulate the fisheries on the westerly side of the river. . Even these reserved rights of New Jersey are further qualified by a provision that they shall be subject to the laws of the State of New York in relation to passengers, and that navigation be not obstructed or hindered.

The limitation of New Jersey's jurisdiction to vessels aground on its shore, or fastened to wharves or docks, and the express reservation by which even those vessels are subject to the laws of New York in relation to passengers, are a plain indication that New Jersey has no control over vessels actually in transit across the river, and the rates to be charged for transportation of passengers thereon.

Our views are further sustained by the legislation of the congress of the United States. By the act to regulate commerce, it is enacted that the provisions of that statute shall apply to any common carrier engaged in the transportation of passengers or property wholly by railroad or partly by railroad and partly by water, when both are used under a common control, management or arrangement for a continuous carriage or shipment from one state or territory to any other state or territory, and the act defines the term "railroad" as including all bridges and ferries used or operated in connection with any railroad. *Sup. Rev. Stat., p.* 529.

The proof in this case shows that the ferry in question is operated by the New York Central and Hudson River railroad, in connection with its railroad, for the transportation of passengers between New York City and points in New Jersey, New York and elsewhere, and that in accordance with the act of congress the schedule of rates charged on the ferry has been filed with the interstate commerce commission. The act of congress is applicable, and since congress has undertaken thereby to regulate the charges for transportation, any right which the State of New Jersey might have conferred originally upon the board of freeholders must

yield to the paramount authority of congress over interstate commerce. That the power of congress is paramount was decided by the court and conceded even by the judges who did not concur in the opinion, not only in the Covington Bridge Company case, but in the case of *Wabash, St. Louis and Pacific Railroad Co.* v. *Illinois,* 118 *U. S.* 557. A further citation of authorities on this point is unnecessary.

The resolutions brought up by this writ should be set aside, with costs.