Booth, Judge,
delivered the opinion of the court:
The plaintiff, a Pennsylvania corporation, sues to recover transportation taxes, alleged to have been illegally exacted under the provisions of sections 500 and 501 of the revenue acts of 1911 and 1918. No jurisdictional question is at issue. *166 Sections 600 and 501 of the revenue act of 1917 (40 Stat. 314) provide:
“ Sec. 500. That from and after the first day of November, nineteen hundred and seventeen, there shall be levied, assessed, collected, and paid (a) a tax equivalent to three per centum of the amount paid for the transportation by rail or water or by any form of mechanical motor power when in competition with carriers by rail or water of property by freight consigned from one point in the United States to another * * *
“ Sec. 501. That the taxes imposed by section 500 shall be paid by the person, corporation, partnership, or association paying for the services or facilities rendered.
“In case such carrier does not, because of its ownership of the commodity transported, or for any other reason, receive the amount which as a carrier it would otherwise charge, such carrier shall pay a tax equivalent to the tax which would be imposed upon the transportation of such commodity if the carrier received payment for such transportation.”
Section 500 of the revenue act of 1918 duplicates the corresponding section in the 1917 act. Section 501 of the 1918 act (40 Stat. 1101) broadens the scope of the preceding statute, and in so doing amends it in the following respect:
“ Sec. 501. (a) That the taxes imposed by section 500 shall be paid by the person paying for the services or facilities rendered.
“(c) The taxes imposed by section 500 shall apply to all services or facilities specified in such section when rendered for hire, whether or not the agency rendering them is a common carrier. In case a carrier (other than a pipe line) principally engaged in rendering transportation services or facilities for hire does not, because of its ownership of the goods transported, or for any other reason, receive the amount which as a- carrier it would otherwise charge, such carrier shall pay a tax equivalent to the tax which would be imposed upon the transportation of such goods if the carrier received payment for such transportation * *
The Commissioner of Internal Revenue assessed and collected the taxes here involved by bringing the following state of facts within the laws: The plaintiff is engaged in generating electric current and supplying the same to customers in the city and county of Philadelphia and near-by places. To accomplish its purposes the plaintiff maintains *167 separate generating plants located in and about the harbor of Philadelphia and one at Chester, Pa. Large quantities of coal are purchased by the plaintiff direct from the mines and delivered to the plaintiff by the Pennsylvania and Reading Railroads at the respective docks and piers of the railroad companies, the plaintiff employing coal exclusively for fuel purposes.
In 1901 the plaintiff and the R. S. Oliver Estate entered into an oral agreement by the terms of which the R. S. Oliver Estate agreed to build a sufficient number of barges, furnish towage therefor, and transport the plaintiff’s coal supply from the piers and docks of the railroad companies to plaintiff’s various stations or generating plants for 17 cents per gross ton, compensation subject to changes in unison with wages paid by the R. S. Oliver Estate for watchmen for the barges. The plaintiff also maintained a “ coal dump,” i. e., a station where surplus coal was dumped as a. reserve supply, and the contract of the parties imposed an obligation on the R. S. Oliver Estate to transport to and from the coal dump as plaintiff’s necessities required. The R. S. Oliver Estate observed the contract, furnished the barges and towage, and in every respect performed the service to the satisfaction of the plaintiff. In 1919 the parties decided to embody the terms of the original oral agreement in some written form, and while it was never reduced to a formally executed contract the terms and conditions of the service to be rendered appear from a series of letters set out in Finding VI. This correspondence discloses that the service was to continue for a period of five years.
From the record we are unable to ascertain the exact status of the R. S. Oliver Estate. Enough appears, however, to warrant the findings that the estate is not engaged generally in the transportation business, is not a common carrier, and was engaged by the plaintiff for the sole and exclusive purpose of carrying and distributing its coal supply as above set forth. As a matter of fact the record shows that the barges used were constructed by the R. S. Oliver Estate in accord with plans and specifications furnished by the plaintiff, so as to conform to the docks and piers of the plaintiff, *168 and are kept in repair, as well as replaced when worn out, at the expense of the R. S. Oliver Estate. If additional barges are needed to care for an increased supply of coal, the R. S. Oliver Estate builds and furnishes the same, the plaintiff furnishing and paying for the labor for loading and unloading the barges. The R. S. Oliver Estate pays the cost of towage, employing tugs therefor owned by other parties, and keeps and maintains watchmen for the safety of the barges. The barges are occupied exclusively in the plaintiff’s service and practically all the time, Sundays as well as week days.
The plaintiff in its brief and oral argument emphasizes the position that the service rendered is in pursuance of a private contract to make available for its business purposes its own supply of coal, and that the transportation furnished is not within the purview of the statute as to transportation “ of property by freight consigned from one point in the United States to another.” The defendant combats the contention, asserting the comprehensiveness of the act, and predicating a defense upon a contract of affreightment between the parties rather than a demise of the vessels to the plaintiff.
The sections of the revenue acts involved originated in war time. The Government was extending the sources of revenue to meet existing emergencies, and unless we may hold that the transportation facilities furnished by the R. S. Oliver Estate and the services rendered were not in a strict and technical sense the carriage of freight, etc., we must sustain the imposition of the tax. It is the character and the nature of the business of the carrier which determines the issue. Section 501 of the act of 1918 removes all doubt as to the intent of Congress to extend the act to all services or facilities engaged for transportation, whether the carrier is a common carrier or not, and thereby leaves but one avenue of escape for the plaintiff, and that is the question of transportation by freight. To the common understanding, transportation by freight signifies the carriage of goods, wares, or merchandise by a method or agency involving a delayed delivery as compared with speedier and more *169 expensive methods of performing the same service. It is true it is generally understood as involving the use of common carriers, the issuance of a bill of lading, and perhaps other observance of details not usually observed when other methods are employed; but to so hold in this case would entail the necessity of confining the acts to transportation by common carriers, and this position is manifestly untenable. The plaintiff might have transported its own coal in its own barges, at its own expense, and escaped the payment of the tax, for the revenue act in imposing the tax sets up as a test a transportation for hire, and if not for hire, manifestly the statute is inapplicable.
The law says where one is principally engaged in transportation for hire and transports his own goods, the tax follows; likewise, where a carrier is principally engaged in transporting his own goods and incidentally carries for hire, the incidental service is taxable. Therefore, it seems that the determining factor is the furnishing of service and facilities for transportation for hire. Beyond doubt this a case of transportation for hire. If, however, plaintiff chooses to avail itself of an independent agency and pay to accomplish what it might have done, liability for the tax attaches when the character of the agency falls within the express terms of the taxing law. A binding contract to carry for hire a large volume of coal for a period of five years made by a distinct and separate agency can hardly be said to be a service wherein facilities are not furnished for the express purpose of transportation. Surely the Oliver Estate, under the circumstances of this case, was as to the plaintiff engaged in the transportation business within the meaning and intent of the revenue laws. Transportation, as said in Gloucester Ferry Co. v. Pennsylvania), 114 U. S. 196, 203, “ implies the taking up of persons or property at some point and putting them down at another.” Did Congress use the term “ property by freight in any qualifying or restricted sense, or was it simply to distinguish between freight' and express,” etc. ? Obviously a more comprehensive meaning was intended than the ordinary freight service furnished by common carriers by rail or water.
*170 The statute says: “transportation by rail or water or by any form of mechanical motor power when in competition with carriers by rail or water,” indicating an intention to give an unrestricted meaning to the term “property by freight ” and is not limited to a transportation by common carriers as we usually think of the same. A truck service, by auto trucks operating between Philadelphia and New York, would assuredly come within the acts. The plaintiff does not contend against the existence of competition in the harbor of Philadelphia as to the service furnished, and the record discloses the carriage of the coal from points in the harbor of Philadelphia to Chester, Pa. The imposition of the tax upon a carrier transporting his own goods when his principal occupation is rendering transportation service for hire, a like liability for the tax when the carrier principally engaged in transporting his own goods departs from his customary course, and transports for hire upon that portion of the transportation for which hire is paid, seems to clearly indicate that Congress intended to resort for revenue to the very class of transportation involved in this case. As a matter of fact, the statutes recognize but tivo exemptions, neither of which are applicable here. The exceptions in a law uniformly point out the extent of its applicability.
Some but apparently no great effort is made to construe the contract as a demise of the vessels and not a contract of affreightment. It requires more than the exclusive right of user to warrant such a construction. The authorities are numerous and quite too familiar to warrant extensive citation, that the courts are not inclined to lean toward giving contracts of this character the effect of demising the vessels unless it clearly appears that the owner completely parts with possession, command, and navigation of the vessel. Reed v. United States, 11 Wall. 591. The lessor must become the owner pro hac vice. In this case the Oliver Estate did agree to furnish the barges and keep them in the exclusive service of the plaintiff, but the towage was furnished by the estate and the vessels directed by the owners to go to and from such points as ordered by the plaintiff’s agents, the Oliver Estate receiving and executing the orders. The rate agreed upon for their use was subject to fluctuation, and the *171 owner’s conceded liability for loss occasioned by any negligence upon the part of its employees. We think the plaintiff availed itself of the service and facilities of transportation within the meaning of the revenue acts, and the petitios will be dismissed. It is so ordered.
Geaham, Judge; Hat, Judge; Dowhet, Judge; and Campbell, Chief Justice, concur.