ILLINOIS CENT. R. CO. v. MISSISSIPPI RAILROAD COMMISSION et al.

YAZOO & M. V. R. CO. v. SAME.

(District Court, S. D. Mississippi.   April 14, 1914.)

1. TAXATION &wkey;498—ASSESSMENT—POWER OF COURTS TO RESTRAIN.
      A court of equity has power to enjoin the taxing authorities of a state from systematically and intentionally overvaluing the property of one class of property owners as compared with that of another class, though the discrimination is due to the fact that the property of the latter is undervalued, and although the valuation of the two classes is by different taxing boards, and both made under a constitutional provision requiring all property to be assessed at its true value; but where the state authorities act in good faith, with the intention of making the assessment on the same basis as that applied to other classes of property, their action is not subject to collateral review by the courts for an error of judgment.
      [Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 913–919; Dec. Dig. &wkey;498.]

2. COMMERCE &wkey;69—TAXATION &wkey;47—PRIVILEGE TAXES ON RAILROAD COMPANIES.
      The privilege tax imposed on railroad companies by Act Miss. March 16, 1912 (Acts 1912, c. 102), is not invalid, as an additional property tax, because the amount is determined by the mileage of the road within the state and its gross earnings, in accordance with which the roads are classified for the purpose of fixing the rate, but, inasmuch as it prohibits under penalty and without exception the operation of a railroad in the state for any purpose without first paying the tax and obtaining a license, it is unconstitutional and void, as imposing a tax on interstate commerce and on the doing of government business.
      [Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 100, 113–119; Dec. Dig. &wkey;69; Taxation, Cent. Dig. §§ 104–114; Dec. Dig. &wkey;47.]

In Equity.   Suits by the Illinois Central Railroad Company and by the Yazoo & Mississippi Valley Railroad Company against the Mississippi Railroad Commission and others.   On motion for preliminary injunction.   Denied in part, and granted in part.

Mayes & Mayes, of Jackson, Miss., Charles N. Burch and H. D. Minor, both of Memphis, Tenn., and R. V. Fletcher and Blewett Lee, both of Chicago, Ill., for complainants.

Geo. H. Ethridge, Asst. Atty. Gen., of Mississippi, for defendants.

Before SHELBY, Circuit Judge, and NILES and GRUBB, District Judges.

GRUBB, District Judge.   The applications of the two plaintiffs were submitted together for decision, and the questions presented by each are identical.   In each instance, an injunction is sought by the plaintiff railroad company against the Mississippi Railroad Commission

and its three members to prevent them, as the state board for the assessment of railroad property and privileges for taxation: (1) From certifying to the county tax officials the valuation of the property of the plaintiffs, as arrived at by the Commission, upon the ground that the plaintiff's property had been intentionally overvalued, as compared with the taxable property of other owners; and (2) from certifying to the auditor of public accounts and the chancery clerks of the counties through which plaintiff's roads run their findings as to the classification of the plaintiffs as a step in the collection of the privilege tax imposed upon railroad companies by chapter 102 of the Acts of Mississippi of 1912, approved March 16, 1912.

[1] 1. With reference to the ad valorem property tax, we think the authorities establish the right of a court of equity to enjoin the taxing authorities of a state from systematically and intentionally overvaluing the property of one class of property owners as compared with that of another class, though the discrimination is due to the fact that the property of the latter is itself undervalued, and although the valuation of the two classes is by different taxing boards, and that this principle prevails, even though the Constitution of the state requires all property to be assessed at its true value, as well as to be assessed at its uniform value. This principle is sustained by the cases of Taylor v. L. & N. R. R. Co., 88 Fed. 350, 31 C. C. A. 537, and Central R. R. Co. v. Jersey City (D. C.) 199 Fed. 237. Equality and uniformity are the essentials of true value in matters of taxation, and a system of valuation of property owned by one class, the effect of which is to produce inequality and discrimination with reference to similar property owned by other classes, does not tend to arrive at true values, though it may ascertain actual values as to one class. The problem of taxation being to distribute the burden of raising the amount of revenue required for governmental purposes equitably among all taxpayers, the proportion of value to rate is immaterial to the taxpayer, since the product of the two factors must always be the same, whatever their relative proportions in the case of each taxpayer, to produce the required aggregate. If the rate decreases, the value must proportionately increase, and vice versa; otherwise, the total tax would not remain constant. The thing of importance to the taxpayer is that he pay the same rate as all other taxpayers, and that his property be valued on the same basis as other taxpayers, so that of the aggregate burden exacted from all owners he will pay only his proportionate and just share. For this reason uniformity and equality in the valuation of all property of the same class is a greater consideration in assessing property for taxation than is the ascertainment of the absolute and true value of the property assessed.

If the proceedings before the Railroad Commission of Mississippi, and the evidence introduced upon the hearing of these applications, had shown an intentional and systematic overvaluation of the plaintiff's property, as compared with that of individual taxpayers throughout the counties of the state, the application would be entitled to favorable consideration. However, the record of the proceedings had before the

Railroad Commission, introduced in evidence upon the hearing, is convincing that there was no intentional overvaluation of the plaintiffs' property, as compared with the property of other owners throughout the state. It shows an attempt in good faith upon the part of the Commission to assess the plaintiffs' property upon the same basis of value as was used in the assessment of other property in the various counties of the state. In the course of these proceedings the president of the Commission said:

"Then, in pursuance to that line of argument—in stating these things, I refer to myself, because I haven't had a chance to consult my colleagues, but it seems to me that the only thing for you to do is to come before this Commission with an open hand, and give us as nearly as you can the true value of your property, and leave it to us then to decide what we shall make, what reduction we shall make from the true value, so as to harmonize with the other property of the state."

In reply to this statement of the president of the Commission, one of the attorneys for the plaintiffs said:

"Now, Doctor, right here, I want to take you up on that proposition. I say I am perfectly willing to accept that kind of a trade. Now, we have tried to show by these figures what the true value of the property is; now, I am perfectly willing to risk it to this board, which I know is well qualified to judge what the other property is assessed, take the state over, take Mr. Wilson's district, and Mr. Edwards' district, and your district, what is the fair value and roll value, and then take the statement that we make as to the fair value, which we ask you to believe until you have something to the contrary."

These statements show that the Railroad Commission, at least, undertook to assess the plaintiffs' property on the same basis of valuation as prevailed throughout the state, as to that of other taxpayers, and this with the assent of counsel for the plaintiffs. In addition, the evidence of two of the commissioners upon this hearing was to the effect that their purpose and endeavor in making the assessment was to value the plaintiffs' property upon the same basis of valuation as was adopted by the local assessors for all other property in the various counties of the state. They testify that the third commissioner adopted the same method. One of the commissioners differed from the remaining two in the results arrived at, but only because his judgment as to the proportion between actual and assessed value in relation to other property differed from that of his fellow commissioners. The endeavor of all the commissioners seems to have been to arrive at the proper percentage to its actual value that other property was returned for taxation throughout the state, and to adopt the percentage so ascertained by them as the basis for reducing the actual value of the plaintiffs' property to its taxable value. There was, therefore, no intentional overvaluation of plaintiffs' property. If overvalued at all, it was because of the erroneous judgment of a majority of the Commission, and this would be an error not subject to correction collaterally by us. The truth seems to be that all the commissioners were endeavoring to assess the plaintiffs' property at the same proportion of its true value as was all other property throughout the state. The

commissioners differed as to the extent that other property in the state was undervalued; each being governed somewhat by the variant practices in this respect in the part of the state comprising his district, and so differed as to the extent the plaintiffs' property should be reduced from its actual value. The record shows that there was no uniformity in this respect in the counties of the state. In some counties property was returned at 75 per cent. of its actual value, and in some as low as 20 per cent. of that value. There was, therefore, room for honest difference of opinion amongst the commissioners. We see no reason for attributing their conclusion to intentional overvaluation. If there was overvaluation at all, it would seem from the record that it should be attributed to an error of judgment, which we have no power to correct. Coulter v. L. & N. R. R. Co., 196 U. S. 599, 25 Sup. Ct. 342, 49 L. Ed. 615.

It is true that the Railroad Commission refused to consider the consideration of the 25 last transfers tabulated from 68 counties of state as evidence tending to show the percentage of value adopted in those counties for taxable values. The admissibility of such evidence is at least doubtful. Coulter v. L. & N. R. R. Co., 196 U. S. 609, 610, 25 Sup. Ct. 342, 49 L. Ed. 615. In any event the rejection of this evidence by the Commission would be error merely, and would not be ground for collaterally assailing the order of assessment. It is clear from the record that the Commission did undertake to arrive at the proper result through other evidence, and through the commissioners' knowledge of assessments in the different counties of their respective districts, and did not reject the principle of undervaluing railroad properties, so as to equalize true value to the customary assessed value of other property, but, on the contrary, adopted this principle, in good faith, as the correct one, however erroneously they may have applied it.

For these reasons, we think this case is ruled by the case of Coulter v. L. & N. R. R. Co., 196 U. S. 599, 25 Sup. Ct. 342, 49 L. Ed. 615, and that no injunction against the certification of the ad valorem tax should be granted. If there was a probability of a different conclusion being reached upon final hearing, we might be inclined to preserve the status until then, in spite of our present conclusion; but the merits of the plaintiffs' case have been fully presented upon this hearing, through the affidavits, oral evidence of the commissioners, and the record of the proceedings before the Commission, and it is not likely to be, in any material respect, changed upon the final hearing.

[2] 2. The plaintiffs also seek injunction to restrain the Railroad Commission from certifying the classification of the plaintiffs' railroads for the purpose of the collection of the privilege tax, enjoined upon them by chapter 102, Acts 1912. The plaintiffs contend that this privilege tax is in conflict with article 1, section 8, of the federal Constitution, as being a regulation of interstate commerce and with the Fourteenth Article of Amendments, in that it deprives the plaintiffs of their property without due process of law and in denial of equal protection of the law.

As much of chapter 102 as is germane to this inquiry is set out in the margin.[1] It is an amendment of section 3856 of chapter 114 of the Mississippi Code of 1906. Section 1 of the act provides for the classification of railroad companies, for the purpose of levying privilege taxes, into five classes, and levies privilege, taxes, at varying amounts per mile, according to class, upon all railroad companies operating in the state. Section 2 provides that the Railroad Commission shall annually, and before the first Monday of August, classify the various railroads according to their charter and their gross earnings, and that the privilege taxes shall be paid before the 1st day of December, and that the findings of the Commission shall be certified to the auditor of public accounts and the chancery clerks of the counties through which each road runs, and that any person, natural or artificial, who shall exercise any of the privileges taxed, without first paying the tax or procuring the tax or license, as required by law, shall be subjected to the pains and penalties imposed by section 3894 of the Code of 1906, and to such other pains and penalties as may be otherwise provided by law. Section 3 provides that the act shall take effect and be in force from and after its passage. Section 3894 of the Code of 1906 provides that any person or corporate body who shall exercise

---

[1] Section 1. *Be it enacted by the Legislature of the state of Mississippi,* that section 3856 of chapter 114, of the Code of 1906, levying privilege taxes on railroads be, and the same is hereby, amended so that for the purpose of levying a privilege tax on railroads such railroads are divided into five classes, first, second, third, narrow gauge and levee district, and privilege taxes are levied on them as follows:

| | |
|---|---:|
| On each railroad of the first class, per mile (mileage within the levee district or districts on which levee taxes are paid, excepted) | $ 45.00 |
| On each railroad of the second class, per mile (mileage within the levee district or districts on which levee taxes are paid, excepted) | 25.00 |
| On each railroad of the third class, per mile (mileage within the levee district or districts on which levee taxes are paid, excepted) | 10.00 |
| On each narrow gauge railroad, per mile (mileage within the levee district or districts on which levee taxes are paid, excepted) | 2.50 |
| On that part of each levee district railroad of the first class, with the levee district or districts, on which levee taxes are paid, per mile | 20.00 |
| On that part of each railroad of the second class, within the levee district or districts, on which levee taxes are paid, per mile | 15.00 |
| On that part of each railroad of the third class within the levee district or districts, on which levee taxes are paid, per mile | 7.50 |
| On that part of each narrow gauge railroad within the levee district or districts, on which levee taxes are paid per mile | 2.50 |

Sec. 2. The Railroad Commission shall, annually, on or before the first Monday in August, classify the several railroads according to their charter, and the gross earnings of each, and the privilege taxes thereon shall be paid on or before the first day of December, and the findings of the said Railroad Commission shall be certified to the auditor of public accounts and the chancery clerk of the county through which each road or roads run; and any person or persons, natural or artificial, who shall exercise any of the privileges taxed herein, without first paying the tax and procuring the tax or license, as required by law, shall be subjected to the pains and penalties imposed by section 3894 of the Code of 1906, and to such other pains and penalties as may be otherwise provided by law.

Sec. 3. That this act take effect and be in force from and after its passage.

any of the privileges taxed by law in this state without first paying the tax and procuring the license, as required, shall on conviction be fined not less than an amount equal to five times the tax imposed on such privileges, or shall be imprisoned in the county jail not more than six months, or both by such fine and imprisonment.

The plaintiffs contend that the privilege tax is in conflict with the Constitution of the United States upon five different grounds. We find it necessary to consider the first and fifth only. The other grounds are based on the fact that the amount of tax is measured by the mileage of the taxed road, and that the rate is dependent upon its gross earnings. We think, however, that these are mere methods of measuring the amount of the tax, and do not constitute a direct tax on the gross earnings or business of the plaintiffs. Nor do we think the fact that the franchises of the plaintiffs are taxed also as property justifies the interposition of the court, upon the ground that the plaintiffs are subjected thereby to a double burden of taxation.

The first ground is based upon the argument that the act imposing the tax does not differentiate between intrastate and interstate commerce, but taxes the doing of both indiscriminately. The fifth ground is based upon the argument that the taxes imposed by the statute are levied in part upon the business in transportation of the mails, troops, munitions of war, and other property of the United States; that the plaintiffs, by virtue of section 3694 of the Revised Statutes of the United States (Comp. St. 1913, § 6810), are constituted post roads; and that in the handling of governmental business they are agencies of the United States, and nontaxable for that reason.

The privilege taxed by the act is the business of operating a railroad. Any person or corporation who exercises this privilege, without first paying the tax and procuring the license, is subjected to the prescribed penalties. There is no restriction as to the character of business taxed to be deduced from the language of the act. The operation of a railroad by any one and for any purpose is inhibited until the tax is paid and the license secured. Any one who exercises the privilege of operating a railroad for any purpose, without first paying the tax and procuring the license, is liable to the penalties prescribed. The language of the act is inclusive enough to prohibit the operation of a railroad engaged in exclusively interstate commerce. The Supreme Court of Mississippi has not as yet construed the act, so as to make its provisions inapplicable to interstate commerce or government business. If its language contained sufficient ambiguity to admit of such a construction, in order that the act might prevail, rather than be destroyed, it should be so construed. The language of the act, however, is general in its terms, contains no exceptions, and is not ambiguous. This being true, and in the absence of authoritative construction by the Supreme Court of Mississippi, it must be given construction consistent with its language.

In the case of Leloup v. Mobile, 127 U. S. 640, 8 Sup. Ct. 1383, 32 L. Ed. 311, the Supreme Court said:

"It is urged that a portion of the telegraph company's business is internal to the state of Alabama, and therefore taxable by the state. But that fact

does not remove the difficulty. The tax affects the whole business, without discrimination."

In the case of Allen v. Pullman Co., 191 U. S. 171, 179, 24 Sup. Ct. 39, 41 (48 L. Ed. 134), the Supreme Court said:

"In the later act [that of 1887] it is exacted for * * * doing business in the. state. This business consists of running sleeping cars upon railroads not owning the cars, and is precisely the privilege to be paid for under the first act, neither more nor less. In neither act is any distinction attempted between local or through cars or carriers of passengers. The railroads upon which the cars are run are lines traversing the state, but not confined to its limits. The cars of the Pullman Company run into and beyond the state, as well as between points within the state. The act in its terms applies to cars running through the state as well as those whose operation is wholly intrastate. It applies to all alike, and requires payment for the privilege of running the cars of the company, regardless of the fact whether used in interstate traffic or in that which is wholly within the borders of the state. There is no decision of the Supreme Court of Tennessee limiting the act in its operation to intrastate traffic. It is true that the comptroller has sought to restrain the operation of the law by imposing the tax for two years upon cars running between Nashville and Memphis, and between Nashville and Chattanooga for two years, and fixing one car in each year as the proportion of local business done on interstate cars for two years. But this action does not conclude the state in taxing for other years, and the action taken by the comptroller does not limit the terms of the law affecting interstate commerce. * * * We are of opinion that taxes exacted under the act of 1887 are void as an attempt by the state to impose a burden upon interstate commerce."

In the case of Williams v. Talladega, 226 U. S. 404, 419, 33 Sup. Ct. 116, 119 (57 L. Ed. 275), the Supreme Court said:

"We have * * * an ordinance which taxes, without exemption, the privilege of carrying on a business a part of which is that of a governmental agency, constituted under a law of the United States and engaged in an essential part of the public business—communication between the officers and departments of the federal government. The ordinance, making no exception of this class of business, necessarily includes its transaction within the privilege tax levied. This part of the license exacted necessarily affects the whole, and makes the tax unconstitutional and void."

In the case of Oklahoma v. Wells Fargo Co., 223 U. S. 298, 302, 32 Sup. Ct. 218, 220 (56 L. Ed. 445), the Supreme Court said:

"Whether the statute could be construed as separable, of course, would be ultimately for the state court in any event. * * * But we see no possible construction on which it could be upheld without being so remodeled that it would be a mere speculation whether the Legislature would have passed it in the new form. * * * Neither the court below nor this court can reshape the statute simply because it embraces the elements that it might have reached if it had been drawn with a different measure and intent."

The following cases are also in point: Postal Telegraph-Cable Co. v. Charleston, 153 U. S. 692, 14 Sup. Ct. 1094, 38 L. Ed. 871; Pullman Co. v. Adams, 189 U. S. 420, 23 Sup. Ct. 494, 47 L. Ed. 877; Western Union Telegraph Co. v. Kansas, 216 U. S. 1, 30 Sup. Ct. 190, 54 L. Ed. 355; Pullman Co. v. Kansas, 216 U. S. 56, 30 Sup. Ct. 232, 54 L. Ed. 378; International Text-Book Co. v. Pigg, 217 U. S. 91, 30 Sup. Ct. 481, 54 L. Ed. 678, 27 L. R. A. (N. S.) 493, 18 Ann. Cas. 1103; International Text-Book Co. v. Peterson, 218 U. S. 664, 31 Sup. Ct. 225, 54 L. Ed. 1201; A., T. & S. F. R. R. Co. v.

O'Conner, 223 U. S. 280, 32 Sup. Ct. 216, 56 L. Ed. 436, Ann. Cas. 1913C, 1050.

From them the conclusion is irresistible that a state statute exacting of one engaged in interstate commerce and governmental business a license for the privilege of doing business, in general terms and without expressly exempting from its terms interstate and governmental business, and which has not been construed to do so by the court of last resort of the state of its enactment, is to be construed as exacting a license for engaging in all business, including interstate commerce and governmental business, as to persons or corporations so engaged, and void as to them, though so measured as not to come in conflict otherwise with the Constitution. Under the language of the act of Mississippi, railroad companies could be prosecuted for exercising the privilege of doing a railroad business without taking out a license, though they were engaged in business purely of an interstate and governmental character, and there has been no contrary construction of this act in this respect by the Supreme Court of Mississippi.

The cases of Baltic Mining Company v. Massachusetts and S. S. White Dental Manufacturing Company v. Massachusetts, 231 U. S. 68, 34 Sup. Ct. 15, 58 L. Ed. 127, are distinguishable from this case, as they were in fact distinguished from the cases of Western Union Telegraph Co. v. Kansas, 216 U. S. 1, 30 Sup. Ct. 190, 54 L. Ed. 355, and Pullman Co. v. Kansas, 216 U. S. 56, 30 Sup. Ct. 232, 54 L. Ed. 378, by the Supreme Court, in that the corporations in the latter cases were chartered to engage in interstate commerce, their interstate and intrastate business was conducted inseparably, and they had no option, being public service corporations, to decline to engage in either. This was not true of the corporations involved in the former case. They were mining and manufacturing companies, not public service corporations, and clothed with the right to confine their operations to such classes of business as they saw fit, and it was held that their intra and inter state business was conducted separately, so that an excise tax on an establishment for the doing of their business in Massachusetts was not a tax on interstate commerce. Distinguishing the cases then under consideration from the cases cited, the Supreme Court said (231 U. S. 85, 86, 34 Sup. Ct. 18, 58 L. Ed. 127):

"Every case involving the validity of a tax must be decided upon its own facts, and having no disposition to limit the authority of those cases the facts upon which they were decided must not be lost sight of in deciding other and alleged similar cases. In the Kansas cases the business of both complaining companies was commerce, the same instrumentalities and the same agencies carrying on in the same places the business of the companies of state and interstate character. In the Western Union Telegraph Company Case, the company had a large amount of property permanently located within the state and between 800 and 900 offices constantly carrying on both state and interstate business. The Pullman Company had been running a large number of cars within the state, in state and interstate business, for many years. There was no attempt to separate the intrastate business from the interstate business by the limitations of state lines in its prosecution. * * * In the cases at bar the business for which the companies are chartered is not of itself commerce. True it is that their products are sold and shipped into interstate commerce, and to that extent they are engaged in the business of carrying on interstate commerce and are entitled to the protection of the

federal Constitution against laws burdening commerce of that character. Interstate commerce of all kinds is within the protection of the Constitution of the United States, and it is not within the authority of a state to tax it by burdensome laws. From the statement of facts it is apparent, however, that each of the corporations in question is carrying on a purely local and domestic business quite separate from its interstate transaction; that local and domestic business, for the privilege of doing which the state has imposed a tax, is real and substantial, and not so connected with interstate commerce as to render a tax upon it a burden upon the interstate business of the companies involved."

It seems clear that the plaintiffs in this case, being common carriers engaged in interstate transportation by rail, are in the category with the Pullman Company and the Western Union Telegraph Company, public service corporations engaged in interstate commerce, the Kansas cases, rather than that of the Baltic Mining Company, a copper mining and selling company, and the S. S. White Dental Manufacturing Company, a company engaged in the manufacture and sale of dental goods, the cases from Massachusetts, and are not subject to the distinguishing features of the corporations to which attention was directed by the Supreme Court in the cases from Massachusetts.

Following the previous cases, we are impelled to hold that the privilege tax, including as it does all business to the plaintiffs both interstate and governmental, is void, and that an injunction should issue to restrain the Railroad Commission from certifying to the auditor of public accounts and to the chancery clerks of the counties through which the plaintiffs' roads run their findings as to the classifications of the plaintiffs for the basis of rating with respect to the privilege tax.

SHELBY, Circuit Judge (concurring in part). I concur in that part of opinion and the decree in which the court refuses to enjoin the ad valorem tax.