ILLINOIS CENT. R. CO. et al. v. CITY OF MEMPHIS.—110 S. W. (2d) 352.

Western Section.   July 6, 1936.

Petition for Certiorari overruled by Supreme Court, January 16, 1937.

Burch, Minor & McKay, of Memphis, for appellants.
William Gerber and K. C. Larkey, both of Memphis, for appellee.

ANDERSON, J.   The Illinois Central Railroad Company appealed in error from a judgment of the circuit court holding it liable to the City of Memphis for an annual privilege tax of $750 levied by the city under Item 93, article 3, section 1, of the Revenue Act of 1932 (Pub. & Priv. Acts 1931, 2d Ex. Sess., c. 13), upon railroad terminal companies.

It was the contention of the city, which was upheld by the court, that the Illinois Central was exercising the privilege of a railroad terminal company in Memphis and had been doing so for the years 1932, 1933, 1934, and 1935, in that:

(a)  It owned and operated a central passenger depot in Memphis

which was used not only by the Illinois Central and its subsidiary, the Yazoo & Mississippi Valley Railroad Company, but also by the St. Louis & San Francisco Railroad Company, hereinafter referred to as the "Frisco," and the Chicago, Rock Island & Pacific Railway Company, hereinafter designated as "Rock Island."

(b) That it had a contract with the St. Louis Southwestern Railway Company, hereinafter referred to as the "Cotton Belt," made January, 1921, and still in effect, whereunder the Illinois Central performed for that company the functions of a railroad terminal company.

The Illinois Central contended that the tax in question was directed at railroad terminal companies such as were authorized by the Act of 1893, chapter 11, and not against an ordinary commercial railroad company which, as a small incident to and an "integral part" of its business as such, and for the greater convenience of the public and of commerce, extended the use of its terminal facilities to other companies; and that all business handled under its contracts with the other three railroads was interstate, for the doing of which the tax could not be levied. It further contended that all the service rendered and facilities furnished by it under the three contracts mentioned were such as it could have been compelled to perform and furnish and as to which it had no option.

As stated the trial before the circuit judge resulted in a judgment holding the Illinois Central liable for the tax for the years mentioned and as contended for by the city, and this judgment is challenged by appropriate assignments of error which we find it unnecessary to consider separately.

The facts are without substantial dispute. The Illinois Central is a corporation organized and existing under the laws of the State of Illinois, as a common carried of freight and passengers, with lines extending through several states. One of its lines extends from Chicago through Memphis to New Orleans. The Yazoo & Mississippi Valley Railroad Company is a subsidiary of the Illinois Central and its lines are a part of the Illinois Central system. The Illinois Central has a large terminal station in Memphis which was built a number of years ago for its own use. The building is some eight stories in height. On the ground floor are ticket offices, a limited concourse, baggage room, and dining room. On the next floor are a large concourse with accommodations for the comfort of passengers, a news stand, and a barber shop. Neither the dining room nor the news stand is operated by the Illinois Central but it merely leases them to an operating company. The barber shop is leased to a barber. The remaining floors are used as offices by the Illinois Central, with two exceptions, namely, one room is set apart for the use of conductors of all lines entering the station, where they store their uniforms, change their clothing, and

the like. Another room is rented to a claim agent of the Frisco, who has nothing whatever to do with the operation of the station. The Illinois Central does not receive, handle, or transfer passenger traffic of railroad companies other than for itself and its subsidiary at this station. It has not leased to any railroad company its facilities at this station except as hereinabove indicated by the contracts mentioned, one with the Rock Island and one with the Frisco. The Illinois Central also has several large freight yards in the City of Memphis used for the making up of trains and storage of cars and the like. Each yard is connected with all others by railroad tracks which form a belt line practically encircling the City of Memphis. As a result a large number of important industries in Memphis and its environs are located on the tracks of the Illinois Central and are served alone by it.

It likewise maintains freight houses for receiving, delivering, and transferring freight; cotton loading and unloading platforms, teaming tracks, scale tracks, icing tracks, a roundhouse and machine shop used for the repairing and overhauling of locomotives and cars.

In its passenger station there is a terminal railway post office, which has been since prior to the year 1932 leased to the United States government, the present rental being $10,000 per annum. In the same station there is a space suitable for handling the express business devoted thereto, which is leased to the railway express agency and has been so leased prior to the year 1932, the rental being $10,229.51 per annum.

All of these facilities were constructed by the Illinois Central many years ago primarily and essentially for its own use as a commercial railroad and were being so used by the Illinois Central at and prior to the time that the contracts upon which the city's claim is predicated were entered into.

In 1911 the Illinois Central entered into contracts with the Frisco and the Rock Island which were continued in substantially the same form through the years 1932-1935, inclusive. Under these contracts the Frisco and Rock Island were permitted to use the passenger terminal facilities of the Illinois Central consisting of tracks, platforms, and that part of the station devoted to the accommodation of passengers, the sale of tickets, the checking of baggage, and such other facilities and appurtenances provided by the Illinois Central in the conduct and handling of the passenger, express, and mail business. Under these contracts the Illinois Central furnishes no space for parking cars or roundhouse for engines. It does no switching for either of these companies with these exceptions: (1) Both contracts provide that "the Central Company will switch through cars of one party thereto to the trains of the other at said station" without charge. The only service rendered under this provision is to transfer daily to the Rock Island the pullman running from Chicago, Ill., to Hot

Springs, Ark., and to transfer the same pullman from the Rock Island to the Illinois Central on its return trip. (2) Beginning June, 1936, the Illinois Central started to switch one sleeper daily for the Frisco, the charge therefor being $2 per day. (3) Occasionally, during the strawberry season, the Illinois Central would transfer a car to the Rock Island, or the Frisco. The Frisco contract—the Rock Island contract is to the same effect—grants to the trustees of the Frisco the right to use jointly with the Illinois Central the passenger depot, including tracks, platforms, and the like and adds:

"Said Passenger Terminal shall be used by the Trustees only for the arrival, loading, unloading and departure of their passenger trains. . . . The trains, engines and cars of the Trustees shall remain within the Passenger Terminal only for a reasonable length of time to permit the unloading and necessary switching of such trains, engines and cars of the Trustees."

"The Trustees shall have the right to switch with their own engines their own engines their passenger trains and cars upon the tracks of said Passenger Terminal to the extent necessary to handle and conduct their business, and to switch their passenger trains and cars with their own engines to and from the tracks of said Passenger Terminal from and to the passenger storage and cleaning yard of the Trustees."

The trains of the Frisco and the Rock Island are made up in the respective yards of those companies and all such trains enter and leave the Illinois Central station under their own power. Such trains are broken up in the same yards. The contracts further provide that the tenant lines must furnish at their own expense all tickets, baggage checks, and other printed forms required for the handling of their business. The tenant lines provide their own inspectors for trains entering and leaving the station.

The Frisco contract provides for six classes of service to be furnished by the Illinois Central—light repairs, materials and supplies, water, coal, sand, and cleaning of cars. These services are to be furnished by the Illinois Central only in cases of emergency. The proof is that in fact the Illinois Central renders no such services to the Frisco. The Illinois Central furnishes no storage yards for the Rock Island and the Frisco. It does not receive, handle, deliver, or transfer passenger traffic of railroad companies other than itself and its subsidiary at this station.

All business done at the Illinois Central station by the Frisco and Rock Island is interstate, with the exception that passenger business is handled by the Frisco between Memphis and two small stations in Shelby County, 8 and 13 miles respectively, from Memphis, both of which are mere villages located on concrete highways as a result of which the business is altogether negligible.

The Illinois Central is not incorporated as a railroad terminal com-

pany under the Act of 1893, chapter 11, now Code, sections 4060-4065, or any similar legislation. Neither the Rock Island nor the Frisco has undertaken to guarantee the principal or interest of any bonds of the Illinois Central nor does either of said companies own any stock or bonds of the Illinois Central or its subsidiary. The Illinois Central is not undertaking to guarantee the principal or interest of any bonds of the Rock Island or Frisco and does not own any stock of either of those companies. This proof was made for the purpose of showing that the Illinois Central does not exercise the powers or use the privileges given by the statutory charter of a railroad terminal company to guarantee bonds of its patron lines, to have them guarantee its bonds, to own stock and bonds of patron companies, and to have them own its stock and bonds.

In view of the conclusion we have reached we deem it unnecessary to further state the provisions of the Frisco and Rock Island contracts.

On March 1, 1921, the Illinois Central entered into a contract with the Cotton Belt, which contract was in force during the period here in question, under which it agreed to render and has been rendering certain service for that company. All of the Cotton Belt property lies west of the Mississippi river. It has no line of railroad into Memphis. Its trains come into Memphis over the Harahan Bridge and thence by a track belonging to the Bridge Company to a point near the intersection of the Illinois Central lines and Broadway where there is a connection between the bridge track and the Illinois Central tracks. All trains of the Cotton Belt enter and leave the Iowa avenue yard of the Illinois Central under their own power. When a Cotton Belt train enters this yard it is taken charge of by the Illinois Central, which then makes delivery of all carloads of freight to the plants or industries for which such freight is destined, and takes the "less than carloads" of freight to a space in the freight depot of the Illinois Central where it is handled by the Cotton Belt agent, who occupies the space in the Illinois Central freight house under a provision in the contract to the effect that, "for the use of the Cotton Belt agent and his force," the Illinois Central shall "provide suitable office space with heat, light and water therefor." The less than carload freight is handled by the warehouse force of the Illinois Central but the delivery to the consignee is presumably made by the Cotton Belt agent and his force who likewise presumably collect the freight charges thereon.

The Cotton Belt trains enter the Illinois Central Iowa avenue yard and are immediately taken in charge by the switch engine and crews of the Illinois Central. The Cotton Belt engine is disconnected from the cars and proceeds with its crew to the roundhouse of the Illinois Central.

At said roundhouse the Illinois Central furnishes and performs the

services for turning, storing, cleaning, and otherwise caring for Cotton Belt engines, in the same manner as road engines of the Illinois Central are cared for between runs.

The contract also provides that the Cotton Belt shall have the privilege of having its engines supplied with coal, oil, water, and other supplies at prices stipulated in the contract, and to have ordinary running repairs made to Cotton Belt engines and necessary repairs to equipment at the usual price.

It is contended by the Illinois Central that the repairs made under this provision of the contract were negligible. It appears that the total number of cars handled for the years 1932-1935, inclusive, was 106,945, and that during the same period 2,935 engines were handled, making a total of 109,880 pieces of equipment, each car being counted twice, once on entering and once on leaving the Iowa avenue yard. From a calculation made in the brief filed on behalf of the Illinois Central, which is not challenged, it appears that the repair charge during the four-year period was 6 cents on each piece of equipment or an average of 1½ cents per annum.

In consideration of that portion of service indicated rendered by it under the contract and the use of its facilities, the Illinois Central is paid upon the following basis:

"(a) The sum of eight dollars (8.00) per car for each car, whether loaded or empty, in each road train of the Cotton Belt arriving at or departing from said Iowa Avenue Yard, destined to or originating at a point on the tracks of the Companies, within the switching limits of the Memphis Terminal District; and

"(b) The sum of seven dollars (7.00) per car for each freight car, whether loaded or empty, in each road train of the Cotton Belt, arriving at or departing from said Iowa Avenue Yard, to be delivered to or received from a connecting line within the switching limits of said Memphis Terminal District, or destined to or coming from a point on the lines of railway of either of the lines of railway of the companies, containing traffic on or for which the Companies, or either of them, shall receive or participate in the road haul revenue; and

"(c) The sum of eight dollars (8.00) for each road engine of the Cotton Belt handled through said Memphis Locomotive Terminal, which charge shall cover the services of turning, storing, cleaning and other services to such Cotton Belt engines, in such manner as road engines of the Companies are cared for between runs."

For the four-year period, 1932 to 1935, inclusive, the Illinois Central received from the Cotton Belt for services rendered under the contract the sum of $894,589.97, or an average of $223,647.49 per annum. This amounted to between 2 and 3 per cent. of the revenue of the Illinois Central at Memphis. From a standpoint of cars handled the percentage was between 3 and 4 per cent.

The services alleged to be required by the contract to be rendered by the Illinois Central, which are mainly relied upon by the city as establishing the proposition that the Illinois Central is engaged in the business of a railroad terminal company in addition to the commercial railroad business, are set out in its brief as follows:

"1. The Illinois Central provides suitable office space in one of its freight houses for the Cotton Belt Agent and furnishes him with the necessary heat, light and water.

"2. The Illinois Central furnishes the necessary switch engines and crews and performs the work of switching the Cotton Belt cars from and to Iowa Avenue Yard to and from all points within the switching limits of the Memphis Terminal District.

"3. The Illinois Central performs the work of making up and breaking up of freight trains of the Cotton Belt arriving and departing from said Iowa Avenue Yards.

"4. The Illinois Central provides the Cotton Belt with its Inbound and Outbound freight houses, team tracks, hold tracks, yard tracks, cotton platforms, stock pens, industry tracks, icing tracks, and interchange tracks with other lines of railroad.

"5. The Illinois Central performs the work of inspecting freight cars of the Cotton Belt subsequent to arrival in Cotton Belt trains at Iowa Avenue Yard and prior to departure in trains of the Cotton Belt from said Yard.

"6. The Illinois Central performs the work of coupling up the air hose and testing the air brakes on outbound Cotton Belt trains.

"7. The handling of less than car load Cotton Belt business is performed by the Illinois Central at the Illinois Central inbound and outbound freight houses by the warehouse forces of the Illinois Central.

"8. The Illinois Central handles with its labor, cotton shipments for the Cotton Belt at its Calhoun Street cotton platform.

"9. The Cotton Belt engines are permitted to use the locomotive Terminal of the Illinois Central when Cotton Belt engines are supplied with coal, oil, water, and other supplies.

"10. The Illinois Central is obligated to and does make ordinary running repairs to the freight engines of the Cotton Belt at the Locomotive Terminal.

"11. The Illinois Central is obligated to and does make necessary repairs to freight cars handled by or for the account of the Cotton Belt.

"12. The Illinois Central performs the service of transferring freight of the Cotton Belt from bad order cars, and for matching cars of car load freight so to be transferred."

The statement under item 7 above is not altogether accurate. Under the contract the handling of Cotton Belt business in the freight house

of the Illinois Central is to be performed under the supervision of the local agent of the Illinois Central but it is further provided that the Cotton Belt shall maintain its own agent, clerks, and stationery, and perform the clerical work required in handling Cotton Belt shipments. For this service the Cotton Belt agreed to pay the Illinois Central monthly such proportion of the cost of warehouse labor and warehouse foreman, plus 10 per cent. thereof to cover accounting and supervision, as the number of tons of freight handled for the Cotton Belt each month bears to the total number of tons handled at said freight house during that period.

The cost of handling cotton under item 8 above quoted is prorated on substantially the same basis, that is, upon the proportion that the · number of bales handled for the account of each contracting party bears to the total number handled plus 10 per cent.

Water, coal, oil, and other supplies are furnished by the Illinois Central at specified prices.

We do not think that the contracts with the Frisco and the Rock Island and the services rendered thereunder by the Illinois Central afford any basis for the judgment of the trial judge because, from our viewpoint, the services called for thereby do not to a substantial degree involve the exercise of the functions peculiar to a railroad terminal company as hereinafter defined. There is therefore no necessity for any further discussion of these contracts. If the judgment is to be sustained, it must be done by reason of the obligations of the Illinois Central under its contract with the Cotton Belt.

It is insisted by the Illinois Central that, while under this contract it exercises some of the functions of a railroad terminal company, they are also functions of a commercial railroad company and that all that is done under that contract is incident to the business of a commercial railroad company and "an integral part" of such business, and hence can afford no basis for the tax.

As stated, primarily, the Illinois Central is strictly a commercial railroad and has been for many years. The facilities owned by it in and near Memphis were acquired and constructed many years ago primarily for the use by the Illinois Central in its commercial railroad business.

It is settled, however, in this State that where a commercial railway company superadds to duties required of it by its charter other forms of business, it must pay the privilege tax therefor. Memphis & Little Rock Railroad v. State, 9 Lea (77 Tenn.), 218, 42 Am. Rep., 673; State v. Union Railway Co., 129 Tenn., 705, 168 S. W., 575, Ann. Cas. 1915D, 1240. Appellant concedes this is to be the law but properly contends that it has no application if the superadded business is an "integral part" of the primary business. The principle relied upon is found in this State in the case of Maxwell

House Operating Co. v. Nashville, 7 Tenn. Civ. App., 336, 337, in which certiorari was denied by our Supreme Court.

In that case the Maxwell House Company, under the tax levied on "hotels and taverns" paid a tax of 75 cents per annum "for each room excepting dining rooms, kitchens and parlors." Its dining room was originally on the second floor of the hotel but apparently, because of changing business conditions and competition, it established a café on the street floor, to which it invited the general public regardless of whether they were guests of the hotel. The City of Nashville sought to collect a privileges tax levied by the same statute on "restaurants and cafes." The Maxwell House Company resisted the levy on the ground that the café was an integral part of its hotel business and covered by its hotel license, notwithstanding that it paid no privilege tax on its dining rooms or kitchens. The city contended that even if this were true the Maxwell House Company was still liable for the tax because its café was intended to be patronized and was patronized by many persons who were not guests of the hotel.

It was held that the Maxwell House Company was not liable for the tax for the reason that its café was "an integral part" of its hotel business and the right to operate the hotel carried with it the right to extend the use of the café to persons who were not guests of the hotel. This case and the case of Stockell v. Hailey, 144 Tenn., 49, 54, 229 S. W., 382, which reapproved the principle, settled the rule relied upon by the appellant.

Upon this phase of the matter the question therefore to be determined is whether the services rendered by the Illinois Central under its contract with the Cotton Belt can be said to be an integral part of the business of the former as a commercial railroad.

In determining this question it becomes necessary to consider the proper functions of a commercial railroad and those of a terminal company. They doubtless have many in common but there is nevertheless a well-organized distinction between the business of a commercial railroad and that of a terminal company. A leading case upon the question is that of State v. Union Railway, 129 Tenn., 705, 168 S. W., 575, 579, Ann. Cas. 1915D, 1240.

In defining terminal companies as distinguished from railroad transportation companies, the court in that case quoted from United States v. Terminal Railroad Association of St. Louis, 224 U. S., 383, 402, 32 S. Ct., 507, 56 L. Ed., 810, 816, 817, as follows:

"We are not unmindful of the essential difference between terminal systems properly so described and railroad transportation companies. The first are but instrumentalities which assist the latter in the transfer of traffic between different lines and in the collection and distribution of traffic. They are a modern evolution in the doing of railroad business, and are of the greatest public utility."

The court then proceeded to analyze in detail the terms of the contract calling for services to be rendered by the Union Railway to another railroad, in the performance of which the court found the Union Railway Company to be doing the business of a terminal railway company and as such liable for the privilege tax here involved, notwithstanding that it was incorporated as a commercial railroad and not as a terminal company and this upon the theory that it had superadded to duties required of it by its charter the business of a terminal railway company.

It would be useless to extend this opinion by a detailed comparison between the provisions of the contract affording the predicate for the conclusion reached by the court in the Union Railway Case and those in the contract between the Illinois Central and the Cotton Belt here involved, which we have hereinabove set out.

In some material respects the contracts differ; in others the same character of service is required of the Illinois Central under its contract with the Cotton Belt as was required of the Union Railway Company. Some of the differences are in favor of the contentions of the city; others we conceive to be in favor of the contention of the Illinois Central.

The fact nevertheless remains that, although it maintains an agent in the City of Memphis and apparently accepts freight for delivery by it (not by a connecting line under through routing) at that point, it is altogether dependent, so far as the transportation of freight is concerned, for its terminal facilities and activities upon the Illinois Central, and this solely by reason of its contract with that company, which appears to be exclusive in its nature.

We are unable to agree to the contention that the services rendered to the Cotton Belt are an integral part of the business of the Illinois Central as a commercial railroad within the principle announced in the Maxwell House Company Case.

The predicate for the decision in that case is to be found in the quotation from the Kentucky case of New Galt House Company v. City of Louisville, 129 Ky., 341, 111 S. W., 351, 352, 17 L. R. A. (N. S.), 566, as follows:

"Indeed, a hotel could hardly be conducted successfully if the proprietor did not afford the guests an opportunity to obtain food within the building. Some men might readily lodge in a hotel and secure their meals at another place; but the general traveling public, including women and children, could not do this, and we may assume that no hotel could be successfully conducted which did not provide food for its guests. If the appellant operated on the 'American plan,' and in addition, conducted a restaurant in connection with its business, there would be some ground to claim that a double license was due. But it must be assumed that, when the city imposes upon

appellant the payment of a license of $150 for conducting a hotel, it intends that it shall have the privileges ordinarily included in the business of the hotel; and certainly, if this was not the intention, it was incumbent upon the city to declare a contrary intention in clear and unmistakable language.''

We think it could not be reasonably said that the business of the Illinois Central as a commercial railroad could not be conducted as such unless it afforded to the Cotton Belt all of the services required by its contract. Other commercial railroads conduct their respective businesses without affording similar service under such contracts, and the Illinois Central did so presumably prior to the time its contract was entered into; for it appears that the facilities used in the performance of its contract were primarily designed and used by it for commercial railroad purposes and not in anywise with a view of rendering primarily those services peculiar to a railroad terminal company. In fact the superintendent of the Illinois Central testified in effect that the business of the Illinois Central as a commercial railroad could be operated without the Cotton Belt contract.

Without extending the discussion further we conclude that under the holding in the case of State v. Union Railway Company, supra, the Illinois Central is performing very substantial services to the Cotton Belt which are the peculiar functions of a railroad terminal company as distinguished from those of a commercial railroad, and which are not an ''integral part'' of the latter business, within the meaning of the holding in Maxwell House Company v. Nashville, supra, and other cases of similar import.

In reaching this conclusion we have not been unmindful of the contention made by the appellant in the very able brief filed by it to the effect that, in all that it does under the contract, it is doing what any railroad company does and must do—handling cars of other companies and providing facilities therefor. One of the illustrations pertinent to this contention is stated in the brief thus:

''Let us suppose that no such contract as that with the Cotton Belt existed. The Cotton Belt would bring into Memphis a train of one hundred cars of carload freight. Probably half of them would be for further transportation on the Illinois Central lines, or for Memphis industries on the Illinois Central. The Cotton Belt would deliver to the Illinois Central, at an agreed interchange point, those fifty cars and the Illinois Central would then deal with them exactly as their contract provides. The entire cut of fifty cars would be taken to our distribution yards and there broken up so as to effectuate further handling and delivery.

''Similarly, in the absence of any such contract, the Illinois Central would collect into its distribution yards cars received at points on its line and destined for the Cotton Belt. These would be cars coming

in over the Illinois Central lines to Memphis or cars picked up by the Illinois Central at various industries in Memphis served by the Illinois Central lines. It would take them to its distribution yard, there make up a complete cut of these cars and deliver them to the Cotton Belt at an interchange point established by the two companies.

"If the track on which the Cotton Belt enters Memphis connected with the tracks of no company other than the Illinois Central, the latter would receive all of the hundred cars on inbound shipments and handle accordingly and collect and deliver to the Cotton Belt all of the cars on outbound shipments."

In this connection we refer to the following pertinent observation of the court in the Union Railway Company Case:

"The fact that commercial railway companies necessarily, under through routings, deliver the cars of other railroad companies on their own terminals to the destinations of such cars thereon, which duty is likewise imposed by the charter of such companies in this state, should not be confounded with the more complicated terminal duties of railway terminal companies which act as go-betweens or intermediaries between the numerous railroads with which they are in physical contact."

The business performed by the Illinois Central under its contract with the Cotton Belt is not pursuant to its obligation under a through routing of freight to a point or destination on its lines or with respect to outbound freight under a through routing of freight originating on its lines or beyond destined for delivery to the Cotton Belt and points beyond, but is pursuant to the particular contract which it has with the Cotton Belt. Its compensation is provided for on the flat rate basis fixed in the contract. It does not, so far as appears, participate in the freight charges collected on the business handled by it which originates or reaches its final destination at Memphis. It collects no freight charges from either consignee or shipper; and has no contractual relation with either; but as stated it is compensated solely by the Cotton Belt under the terms of the contract. It is exclusively entitled to handle all of the business brought into Memphis by the Cotton Belt regardless of the point of destination and to handle all of the business originating in Memphis destined to the Cotton Belt.

Switching charges, assessed by connecting lines on business to and from industries, etc., on such connecting lines are assumed by the Cotton Belt when such charges are absorbed by the rail carriers. The Illinois Central is under no circumstances responsible for the payment of any per diem charges on cars handled by or on the account of the Cotton Belt.

Another provision of the contract which to our minds negatives the idea that it was contemplated by the parties that the services to be

340

rendered by the Illinois Central were to be rendered in its capacity as a commercial railroad is the following:

"The delivery of cars to, and receipt of cars from the Companies (Illinois Central and Y. & M. V. R. Co.) by the Cotton Belt at Iowa Avenue Yard, as herein contemplated, *shall not be considered in any sense an interchange movement,* and, accordingly, such rules as may now or hereafter be in force, covering the interchange of cars between carriers, shall not apply, it being the intention that that part of the railroad of the Companies (Illinois Central and Y. & M. V. R. Co.) used in handling the business of the Cotton Belt shall, for the purposes of this agreement, be considered as an extension or continuation of the railroad of the Cotton Belt; provided, etc." (Italics ours.)

By the proviso there is eliminated from the foregoing part of the contract cars that would be handled by the respective parties under the usual interchange agreements between commercial railroads independent of a contract such as that here involved.

The appellant further contends that under the proof in this record all of the services rendered by the Illinois Central under its contract with the Cotton Belt are so essentially connected with interstate commerce as that they are necessarily without the provisions of the statute authorizing the imposition of the tax by the city; that to hold otherwise would render the tax unconstitutional. This question is fairly raised upon the record and has given the court very considerable concern, primarily because of the fact that it was not passed upon by our Supreme Court in the case of State v. Union Railway, supra, involving a contract between the Union Railway Company and the Cotton Belt calling for the performance by the former of services which as stated were held to render the Union Railway Company liable for the tax levied by the statute pursuant to which the city imposed that here involved. So far as we can ascertain from a careful examination of the opinion in that case, the question now under consideration was not presented to, or considered by, the court. Notwithstanding this fact, since the Union Railway Company was held liable for the tax, it has been with a considerable degree of hesitation that we have assumed to examine the question and reach the conclusion that the contention of the appellant must be sustained. After a very careful consideration of whether this court would be warranted in so doing in view of the decisions in that case, we have concluded that we are justified in assuming from the fact that the question was not presented or discussed that the record there disclosed the performance by the Union Railway Company of the functions of a railway terminal company which were altogether disconnected from interstate commerce, notwithstanding the fact that the contract there involved was with the Cotton Belt Railroad. In other words we find nothing in the record to justify the conclusion that upon this phase of

the controversy the record in the Union Railway Case disclosed solely and only the same state of facts as disclosed by the record in the present case.

■ This brings us to a discussion of this contention. It needs no citation of authority to support the proposition that if it can be reasonably done the act in question will be construed so as to exclude from its provisions activities relating solely to interstate commerce. In other words, if it can possibly be avoided, there will not be ascribed to the Legislature an intention of authorizing the levy by the city of a privilege tax which would be a burden upon interstate commerce.

■ ■ In this connection the contemporaneous construction of the statute involved by the executive authorities of the State is entitled to and has been given great weight. The Rock Island and the Frisco have been using the facilities of the Illinois Central since 1911. The contract with the Cotton Belt has been in force and operation since 1921. The contracts covering these operations have been on file with the Interstate Commerce Commission since they went into effect. Presumably copies were filed at the time with the Governor of the State as required by the terms of the Interstate Commerce Act, 49 U. S. C. A., section 1 et seq. It affirmatively appears that no effort has ever been made by the executive authorities of the State to collect this tax from the Illinois Central. The significance of this inaction cannot be escaped and is a proper matter to be considered by this court.

Upon this point the following from the case of Chattanooga Plow Company v. Hays, 125 Tenn., 148, 154, 140 S. W., 1068, 1069, is pertinent:

"Before determination of the nature of the complainant's occupation or business, it is proper to remark that the assessment and revenue statutes of this state, in force for a great number of years, have been similar in their terms to those under consideration, and the executive department of the government has never before construed them as imposing a merchant's or dealer's tax upon manufacturers such as complainant. The construction placed upon a statute by the officers whose duty it is to execute it is entitled to great consideration. U. S. v. Cerecedo Hermanas Y Compania, 209 U. S., 337, 28 S. Ct., 532, 52 L. Ed., 821; Union Insurance Company v. Hoge, 21 How., 35, 16 L. Ed., 61; Cyc., Vol. 36, page 1140. The weight of such construction is of especial force in the case of statutes prescribing penalties, or levying impositions, where the executive construction has been in favor of the persons affected. U. S. v. One Thousand Four Hundred and Twelve Gallons of Distilled Spirit, Fed. Cas., No. 15,960, 10 Blatchf., 428.

"It is also a settled rule of interpretation in this State that statutes levying taxes or duties upon citizens will not be extended by implication beyond the clear import of the language used, nor will their oper-

342

ation be enlarged so as to embrace matters not specifically pointed out, although standing upon a close analogy. All questions of doubt arising upon the construction of the statute will be resolved against the government, and in favor of the citizen, because burdens are not to be imposed beyond what the statute expressly imports. English v. Crenshaw, 120 Tenn., 531, 110 S. W., 210, 17 L. R. A. (N. S.), 753, 127 Am. St. Rep., 1025; Memphis v. Bing, 94 Tenn., 644, 30 S. W., 745; Crenshaw v. Moore, 124 Tenn., 528, 137 S. W., 924 [34 L. R. A. (N. S.), 1161, Ann. Cas. 1913A, 165]."

█ Needless to say the question of what is interstate commerce and what is intrastate commerce and whether a tax levied by a State or one of its subsidiaries is upon the former, and hence within the constitutional prohibition, are among the most complex with which the courts have to deal. The general rule is of course well settled and easy to state. It is that the State is without power to levy a privilege tax for the conduct of interstate commerce. It finds support in numerous cases, among the many being Robbins v. Shelby County Taxing Dist., 120 U. S., 489, 7 S. Ct., 592, 30 L. Ed., 694; Gloucester Ferry Co. v. Pennsylvania, 114 U. S., 196, 5 S. Ct., 826, 29 L. Ed., 158; Illinois C. R. Co. v. Fuentes, 236 U. S., 157, 35 S. Ct., 275, 59 L. Ed., 517; St. Clair v. Interstate Sand & Car Transfer Co., 192 U. S., 454, 24 S. Ct., 300, 48 L. Ed., 518; Barrett v. N. Y., 232 U. S., 14, 34 S. Ct., 203, 58 L. Ed., 483; Norfolk, etc., R. Co. v. Pennsylvania, 136 U. S., 114, 10 S. Ct., 958, 34 L. Ed., 394; Leloup v. Mobile, 127 U. S., 640, 8 S. Ct., 1380, 32 L. Ed., 311; Texas Co. v. New Orleans, 264 U. S., 150, 44 S. Ct., 242, 68 L. Ed., 611, 34 A. L. R., 907; Illinois Cent. R. Co. v. Miss. R. R. Comm. (D. C.), 229 F., 248; State v. Scott, 98 Tenn., 254, 39 S. W., 1, 36 L. R. A., 461; Milan Milling & Mfg. Co. v. Gorten, 93 Tenn., 590, 27 S. W., 971, 26 L. R. A., 135.

The difficulty lies in the application of the rule to the facts of a given case. The case of Leloup v. Mobile, 127 U. S., 640, 646, 8 S. C., 1380, 1384, 32 L. Ed., 311, affords a pertinent illustration of its application. That case involved the validity of an ordinance of the City of Mobile placing a tax of $225 per annum on "telegraph companies," and the court held the tax void as an interference with interstate commerce, saying:

"In our opinion, such a construction of the constitution leads to the conclusion that no state has the right to lay a tax on interstate commerce in any form, whether by way of duties laid on the transportation of the subjects of that commerce, or on the receipts derived from that transportation, or on the occupation or business of carrying it on, and the reason is that such taxation is a burden on that commerce, and amounts to a regulation of it, which belongs solely to congress. This is the result of so many recent cases that citation is hardly necessary."

In the instant case an exceptionally able brief has been filed on behalf of the city upon this question as well as upon the others involved. Numerous cases are cited in support of the city's contention, followed by an able and exhaustive analysis. It would serve no good purpose to examine them all in this opinion. We content ourselves with a reference to the one upon which the city relies most strongly, and which it is stated in the brief is "on all fours" in principle with the present case.

It is the case of Pennsylvania Railroad Co. v. Knight, 192 U. S. 21, 24 S. Ct., 202, 204, 48 L. Ed., 325.

In that case the Pennsylvania Railroad Company challenged the right of the State to assess it with a franchise tax for carrying on a cab service, wholly within the State, for the purpose of conveying its passengers to and from a ferry landing in New York City.

It appeared that the Pennsylvania Railroad Company established a cab stand on its own premises at the Twenty-Third street ferry in the City of New York and thereafter maintained a service of cabs and coaches under special licenses of the city whereby they could stand on its premises only. The sole business done by those cabs and coaches was to bring the company's passengers to and from the Twenty-Third street ferry. The charges for this service were separate from those of the company for transportation, and no part of its receipts from the cab service was received as compensation for any service outside the State of New York.

The tax was sustained, as clearly appears from the opinion, on the ground that although the Pennsylvania Company was engaged largely in interstate transportation it was amenable to state regulation and state taxation as to any of its service which was wholly performed within the State and not a part of the interstate transportation. In the course of the opinion it was stated: "As we have seen, the cab service is rendered wholly within the state, *and has no contractual or necessary relation to interstate transportation. It is either preliminary or subsequent thereto. It is independently contracted for, and not necessarily connected therewith.*" (Italics ours.)

We think the logic of this opinion instead of supporting the contention of the city in the present case is authority to the contrary. It is true that all of the services rendered or contracted to be rendered for the Cotton Belt by the Illinois Central are to be rendered and are rendered wholly within the State of Tennessee, but we do not think it can be said that such services have no contractual or necessary relation to interstate transportation or that they are contracted for independently of such transportation and not necessarily connected therewith. This for the reason that it appears without dispute that the Cotton Belt can render no other form of transportation service in so far as this State is concerned. It has no lines, no facilities, and no

. equipment for the rendition of any other character of service. Its tracks and property lie wholly west of the Mississippi river. All freight originating in this State destined to the Cotton Belt, as well as all freight brought by the Cotton Belt into Memphis, is necessarily transported, under the proof in this record, in interstate commerce; and every move made by it in connection with the transportation of such freight or by the Illinois Central for it under its contract is necessarily a move essentially connected with interstate commerce. As stated it could not otherwise be for the reason that the Cotton Belt neither delivers nor receives for transportation any intrastate shipments.

That the service rendered by the Illinois Central was rendered for a fixed charge rather than for a proportion of the freight charges collected from the shipper or consignee, and under bills of lading issued not by itself but by the Cotton Belt or connecting lines, is immaterial upon the question of whether the services rendered had a necessary relation to interstate commerce. This appears from the recent decision of the federal Supreme Court in the case of United States v. People of California, 297 U. S., 175, 56 S. Ct., 421, 423, 80 L. Ed., 567, in which there was involved the question of whether the State of California, operating a belt of railroad in San Francisco, was a common carrier engaged in interstate transportation. In holding that it was engaged in such commerce the court said:

"The state insists that the facts that it maintains no freight station, issues no bills of lading, and is engaged only in moving cars for a flat rate instead of at a charge per hundred pounds of freight moved, distinguish the operation of its railroad from that of the Brooklyn Terminal. As the service involves transportation of the cars and their contents, the method of fixing the charge is unimportant. Belt Railway Co. of Chicago v. United States (C. C. A.), 168 F., 542, 544, 22 L. R. A. (N. S.), 582; see United States v. Union Stock Yard & Transit Co., 226 U. S., 286, 299, 300, 33 S. Ct., 83, 57 L. Ed., 226. And while maintenance of a freight station and the issue of bills of lading may be embraced in the service of a common carrier, and a part of interstate commerce, see United States v. Ferger, 250 U. S., 199, 39 S. Ct., [445], 446, 63 L. Ed., 936; Atchison, T. & S. F. Ry. Co. v. United States, 295 U. S., 193, 55 S. Ct., 748 79 L. Ed., 1382, they are not indispensable adjuncts to either where the subject of transportation, here cars loaded and empty, may be effected without."

The cases dealing with the rights of those injured while employed in connection with transportation by common carriers with respect to whether the Federal Employers' Liability Act, 45 U. S. C. A., section 51 et seq., is applicable or the state law, turning upon whether the injury was incurred in connection with interstate commerce, afford light upon the question. Without examining these cases in detail

we are of the opinion that under the decisions an employee of either company injured in connection with any substantial portion of the service contracted to be performed for the Cotton Belt by the Illinois Central would be entitled to invoke the provisions of the federal act on the ground that the injury was inflicted while such employee was employed in interstate commerce within the meaning of that act.

As to such injuries as might occur while the Illinois Central was moving a car under the contract, see Philadelphia & R. R. Co. v. Berman (C. C. A.), 295 F., 658; Erie R. R. Co. v. Downs (C. C. A.), 250 F., 415; Id., 247 U. S., 522, 38 S. Ct., 583, 62 L. Ed., 1247; Delaware, L. & W. R. R. Co. v. Peck (C. C. A.), 255 F., 261; Dennison v. Payne (C. C. A.), 293 F., 333; Hester v. East Tenn., etc., R. Co. (C. C. A.), 254 F., 787; Baltimore, etc., R. Co. v. Flechtner (C. C. A.), 300 F., 318.

As to those that might occur while the injured party was engaged in making "running repairs" to an engine in use in interstate commerce, see Baltimore & O. R. Co. v. Kast (C. C. A.), 299 F., 419; Louisville & N. R. Co. v. Bumpus, Shelby Law, decided by this section of this court December 19, 1932.

As to those that might be injured while engaged in inspecting and repairing cars in the railroad yard, some of which were being prepared for use in interstate commerce, see Hines v. Logan (C. C. A.), 269 F., 105.

As to those that might be injured in loading or unloading a shipment arriving over, or destined to, the Cotton Belt, see Baltimore & O. S. W. R. Co. v. Burtch, 263 U. S., 540, 544, 44 S. Ct., 165, 68 L. Ed., 433.

See, also, 12 C. J., section 24, page 25.

Our conclusion is that the services contracted to be rendered by the Illinois Central to the Cotton Belt have such a necessary relation to interstate transportation as to preclude the idea that there was an intention by the Legislature to levy and authorize the city to levy the tax in question upon such business.

To hold otherwise would be to attribute to the Legislature the intention to tax as a privilege the rendition of services essentially connected with interstate commerce. This we are unwilling to do, and our view in this connection we conceive to be supported by the fact that the executive authorities of the State have never sought to collect this tax for the State.

As stated, in view of the fact that the Union Railway Company was held liable for the same tax in the case of State ex rel. v. Union Railway Co., supra, we have reached this conclusion with a considerable degree of hesitation, but have concluded that, since it does not affirmatively appear from the opinion in that case that the Union Railway Company was not engaged in business of an intrastate char-

acter in addition to the services performed by it under the contract there discussed, that decision is not authority for the view contrary to that which we have taken.

Other questions are raised in the brief which we deem it unnecessary to prolong the opinion by discussing.

The result is that the judgment of the circuit court is reversed and judgment will be entered here adjudging that the Illinois Central is not liable for the tax in question and granting the relief prayed for in the petition for certiorari filed in the circuit court. The city will pay the costs of the cause, including the costs of the appeal.